## B. F. Goodrich Company *v.* Wilson et al., Appellants.

334

Argued December 5, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*George Wharton Pepper*, with him *John V. Lovitt*, for appellants.

*Ira Jewell Williams*, with him *Ira Jewell Williams, Jr.*, of *Brown & Williams*, and *William H. Peace, II*, for appellee.

OPINION BY MR. JUSTICE LINN, January 8, 1940:

This appeal turns on the meaning of a provision in the contract under which the plaintiff, during the year

ending July 31, 1937, supplied tires to the defendant[1] for its buses, trolley coaches and supervisors' and executives' cars. Both parties performed until the end of the term when they differed about the method of then calculating the purchase price of the tires in use. In the contract, the plaintiff is described as "Supplier" and defendant as "Operator". It was agreed that the amount of the consideration payable at specified times by defendant should be determined by the application of formulas based on "used mileage" in what may be described as three classes of cases:

1. (paragraphs 4 and 6) For tires lost, stolen or destroyed (except by natural wear) and tires on buses, coaches or cars sold, defendant agreed to pay on a specified mileage basis.[2] Nothing is due on this account.

2. (paragraph 12) For tires worn out, rates, varying with type of vehicle, were specified, with the provision that if the mileage per tire should exceed 21,000 miles, the rate for mileage in excess of that average should be 50% less, this deduction to be credited quarterly, the last deduction to be made as of the end of the contract period. Nothing is due on this account.

3. (paragraph 10 and part of 12) For tires on hand at the termination of the contract, and then to be purchased by defendant, that is, tires that were not worn out and for that reason not to be included in the two classes just mentioned, defendant agreed to pay according to a specified price formula; plaintiff contends that this formula is substantially[3] the same as that applicable to the second class but without the credit deduction there applicable, while defendant contends that the

---

[1] While the singular is used in this opinion, as it was at the argument, the word is intended to include all the defendants.

[2] For tires lost, stolen or destroyed, the sum of $366.28 was paid; for tires on buses, coaches and other cars sold, the sum of $1,048.27.

[3] The difference is in the period selected for determining average mileage.

formula applies but entitles it to the credit. In argument this deduction or credit allowance was sometimes referred to as a "bonus", and for convenience, we shall use the same term.

The single question now to be answered is whether, with respect to the purchased tires, defendant is entitled to the bonus which would have been allowed if these tires had been used and worn out, or to use the term employed in the contract, "permanently removed" before the end of the term. The learned court below, trying the case without a jury, adopted plaintiff's construction and entered judgment for the amount remaining unpaid, which was the amount claimed by the defendant as the bonus.

We now quote the relevant parts of paragraphs 10 and 12. Paragraph 10 provided: ". . . At the expiration of this agreement and in the event it is not renewed by the parties hereto Operator will purchase all tires furnished hereunder, including all tires on wheels of buses, all spare tires, and all tires in the course of repair, on the basis of the average mileage, for the respective size, obtained by the Goodrich tires removed from service during the six (6) months' period beginning January 1, 1937 and ending June 30, 1937 (except tires removed for cause as set out in Paragraph four (4)[4] hereof) times one-sixth (⅙) of the vehicle mile rate as set out in Paragraph twelve (12) Payments,[5] hereof, less the net amount previously paid for the use of said tires. Payment for said tires shall be made in two equal monthly payments—one-half on the fifteenth day of the first month and one-half on the fifteenth day of the second month following the termination of said agreement."

Paragraph 12 provides: "12 PAYMENTS: Operator will maintain an accurate record of the mileage of buses

---

[4] These are included in class 1 above and have been paid for.

[5] The term "Payments" was apparently used as the title to the subject-matter of paragraph 12, subsequently quoted.

and trolley coaches equipped by Supplier and will keep such records available for inspection by the properly designated representative of Goodrich at all reasonable times. Operator agrees to use a method of computing mileage substantially similar to that now in use by the bus and trolley coach companies managed by it. Not later than the tenth of each month Operator shall furnish Supplier with a statement of mileage of buses and trolley coaches and coaches equipped by Supplier for the preceding month, and with such statement shall make payment for such mileage. The rates per vehicle mile (which shall be deemed to mean a mile that the vehicle actually travels) shall be as follows: . . . [These rates occupy about a printed page and may be omitted here] . . . Should the tire equipment furnished by Supplier hereunder accumulate an average mileage in excess of 21,000 miles, Supplier shall make a deduction of fifty (50) per cent of the rate per bus mile for all bus miles in excess of the average of 21,000 miles. These deductions shall be computed and credit allowed quarterly on:

| | |
|---|---|
| Nov. 1, 1936 | May 1, 1937 |
| Feb. 1, 1937 | July 31, 1937 |

during the life of this agreement as follows: At the end of each three (3) months' period of the term hereof, the average mileage, . . . of tires furnished hereunder and permanently removed from service upon the vehicles of each of said companies (except those removed for causes as stated in Paragraph four (4),[6] during the preceding three months' period, shall first be computed for the respective size. If any or all of such averages are in excess of 21,000 miles, then the difference between the average mileages in excess of 21,000 miles and 21,000 miles, multiplied by the total number of tires permanently removed from service upon the vehicles of each of said companies during said pe-

---

[6] These are included in Class 1 referred to above.

riod, reduced to vehicle miles, and multiplied by fifty (50%) per cent of the vehicle mileage rate applying, shall be credited to Operator's account."

We must give the words their ordinary meaning unless circumstances show that a different meaning was intended, and, so reading them, we begin with the fact that the agreement was not renewed. The fact next to be determined is, At what rate have the parties agreed the purchase price of the tires shall be determined? They have said that this price shall be obtained "on the basis of the average mileage" made by tires removed from service in the first six months of 1937, multiplied by ⅙ of the vehicle mile rate set forth in paragraph 12, less the net amount previously paid for the use of those tires. We then turn to paragraph 12 prescribing the rates per vehicle mile and find that, for the different types of tires, different rates are specified. Immediately following the specification of these vehicle mile rates comes the bonus provision which provides that "these deductions shall be computed and credit allowed quarterly" on four dates specified during the life of the agreement. The term "these deductions" means the bonus prescribed in the immediately preceding lines; in the lines that follow, the parties have agreed how the average mileage shall be computed and credited to the operator's account.

Paragraph 12, then, by itself, provides for the keeping of records by a method of computing mileage substantially similar to that in use when the contract was made,[7] and for the monthly payment of the amount due accompanied by a statement of the mileage. It also provides for the bonus to be determined and credited on the four quarterly dates mentioned and applies to "tires furnished hereunder and permanently removed from service . . . during the preceding three months'

---

[7] This apparently refers to other contracts previously existing between the parties and referred to later in this opinion.

period". We find nothing in paragraph 12, standing by itself, that relates to the purchase price of tires at termination; on the contrary, it has meaning only as applied to tires permanently removed from service; those are the words used. Paragraph 10 deals not with tires "permanently removed from service", but with the purchase price of tires in service at the end of the term and incorporates, by reference, only that part of paragraph 12 dealing with the vehicle mile rate. This is plaintiff's contention, while defendant contends that not only the rates per vehicle mile but also the bonus provision is incorporated. The difference between the plaintiff and the defendant on this appeal is how much of paragraph 12 is incorporated in paragraph 10.

Referring back to paragraph 10, we note the parties have agreed that the purchase price shall be "on the basis of the average mileage" obtained in the first six months of 1937, multiplied by $\frac{1}{6}$ of the vehicle mile rate set out in paragraph 12, less the net amount previously paid for their use. There is nothing in the rates-per-vehicle-mile schedule, itself, that deals with the bonus, and the provision for the bonus specifically applies to "tires furnished hereunder and permanently removed from service". The parties did not say the bonus should apply to all tires furnished but to those "furnished hereunder and permanently removed from service". Applying their ordinary meaning to the words, only one conclusion seems possible and it is, as we all agree, that the bonus provision of paragraph 12, so limited by the parties, was not intended to be incorporated in paragraph 10 and that only the rates per vehicle mile were so incorporated.

In the account, which was attached as an exhibit to the statement of claim, showing the calculations in detail resulting in the amount claimed, and also in defendant's exhibit No. 1 offered at the trial, showing defendant's calculations and also the method of figuring the claimed bonus, both parties used the term "rate

per bus mile" as a substitute for the term "rate per vehicle mile" used in paragraph 12. We think the two are synonymous. In paragraph 12 the phrase "rate per bus mile" plainly refers only to the schedule of rates, excluding the bonus provision; for the deductions were based on "fifty (50) per cent of the rate per bus mile". Hence, the phrase "rate per vehicle mile" in paragraph 10 must also refer to the schedule of rates alone and not to the bonus provisions.

We think, in the circumstances, the meaning of the contract is clear and that we cannot add the words to it which it would be necessary to add to make it read as defendant would have it understood. Compare *National Realty Co. v. Art Club*, 129 Pa. Superior Ct. 99, 195 A. 139; *Fleck-Atlantic Co. v. Insurance Co.*, 326 Pa. 15, 24, 191 A. 51. Defendant appreciated this, for in its brief it is said: "Similarly in the case at bar, had Paragraph 10 in referring to Paragraph 12, added the expression 'for mileage and excess mileage', it would merely have expressed in the particular provision the intent inferable from the contract as a whole. We submit that this was the apparent object and intention of the parties and the same reasoning applies here as was applied by this court in the *Bangor Slate Case*, supra." We do not regard the rule applied in the case referred to, which is reported in 270 Pa. 161, 113 A. 190, as applicable because we think, in this case, the circumstances, by the words used, were dealt with specifically and not generally as in the contract involved in that case.

The brief of defendant speaks of "the obvious intention of the parties, namely, that under this contract tires were sold on the basis of mileage at a rate to encourage long use—the two-part rate." It is said that paragraph 12, in effect, provides for a rate for 21,000 miles, which defendant refers to as one part of the rate and a rate 50% less for the excess over 21,000 miles which defendant describes as the other part of the rate. Even if that analysis of the provision be accepted, the

fact remains that the second part of the rate, the bonus provision, specifically provides for tires permanently removed from service, whereas the tires to be purchased are those which have not been removed from service but which remain in use at the termination of the contract. In defendant's brief it is suggested that one of the reasons for the provision was to stimulate careful use of the tires for the purpose of increasing the "used mileage", and that, if, at the end of the term, the defendant is deprived of the bonus, plaintiff's construction "in fact penalizes appellant". If that is the effect of the words intentionally used by the parties, the words must nevertheless be given their meaning. It has not been suggested that there was any misunderstanding of the meaning intended when the contract was executed. It was prepared by the plaintiff and submitted to the defendant who made changes in it before it was executed. It also appears that the defendant and the plaintiff, or plaintiff's predecessor in title, had contracts providing for tire supply for each year as far back as January 15, 1931. Several of those contracts are attached as exhibits to the affidavit of defense and on the subject of bonus the contract of January 1, 1932, provides: "The unused mileage in said tires shall first be determined . . . The price to be paid for each such tire shall then be obtained by multiplying the said unused mileage so determined by the net rate in effect on August 1, 1932; said net rate to be arrived at by deducting from the base rate then in effect all bonuses to which Rapid Transit may be entitled hereunder." The difference between the provisions of the two contracts is not without significance.

Judgment affirmed.