Mowry, Exr. et al., Appellants, v. McWherter.

Argued May 23, 1950. Before DREW, C. J., STERN, STEARNE, JONES and BELL, JJ.

*Charles F. C. Arensberg,* with him *Robert H. Rial, Thomas L. Wentling* and *Patterson, Crawford, Arensberg & Dunn,* for appellants.

*Vincent R. Smith,* with him *James L. McWherter* and *Louis E. Sensenich,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 26, 1950:

This is an appeal from a decree in equity sustaining preliminary objections, in the nature of a demurrer, to

the bill of complaint. The relief sought is the construction and interpretation of a written agreement, the determination of the rights and obligations of the parties thereunder and the payment of the consideration to the proper individuals in the correct amounts.

The document being construed is characterized by the chancellor as ". . . a home made agreement between two parties, who were virtually partners, and it may not have been artistically drawn. . . ."

In 1943, M. C. McWherter and V. R. Mowry each owned one-half of the outstanding capital stock of a corporation named George Mowry & Co., Inc., engaged in the lumber business. On April 21, 1943, the two co-owners executed the written agreement now in question, the pertinent portions of which are as follows:

"1. That as long as each of said parties are alive they shall each hold the same number of shares of said capital stock, said amount to be kept equal by the issue to the one or the other of treasury stock or otherwise.

"2. Upon the demise of either of said parties the survivor of them shall immediately become the owner of all of the outstanding stock of said company with the option to pay for the same by either of the following methods:

"(a) By guaranteeing in writing to the widow of such deceased party or his heirs an annuity of at least $150.00 per month for a period of 15 years beginning one month from the date of the death of such deceased party.

"(b) By paying to the widow of such deceased party or his personal representative 33⅓% of the net worth of the real and personal property of the said company as of the preceding December 31st.

"3. If Option No. a is adopted by such survivor, he may at any time terminate the plan during said period of 15 years by paying to the widow or personal representative of such deceased party 40% of the net worth of

the company as of December 31st preceding the death of said deceased party less the amount already paid to such deceased party's widow or heirs.

"4. The surviving party shall have a period of one year after the death of such deceased party to select the plan which he proposes to adopt, but in order that said widow may have an income during said period of one year said payments of $150.00 per month shall start one month after the date of the death of said deceased party and continue until the survivor has transmitted to the widow or personal representative of such deceased party in writing the information as to which plan he has elected to adopt, and if he adopts Option No. b he shall receive credit for the amount already paid in said monthly payments of $150.00.

"5. . . ."

Mowry, plaintiffs' decedent, died April 29, 1949, testate, survived by his widow, two sons and a daughter. His son, Paul F. Mowry, was named and qualified as executor. The bill avers that McWherter, *the defendant,* surviving stockholder, notified the executor that "he adopted option (a) as the method under which he elected to pay for the stock formerly held by V. R. Mowry, and later on the same day notified Nellie H. Mowry, the widow of V. R. Mowry, deceased, that he selected option (a) as his method of paying for the stock, *but notified both the Executor and the widow that he would pay only the sum of $150.00 a month and refused to pay the widow any amount in addition to $150.00 a month."* (italics supplied) The widow, executor and children, plaintiffs, allege, in substance, that the provision in article 2(a) concerning payments of "at least $150 per month" standing alone is not clear as to the monthly amounts payable; that it must be interpreted in relation to, and in connection with, *all the clauses of the agreement* and that the true intent must be gathered from the agreement as a whole. It is plaintiffs' contention that the

surviving stockholder obligated himself to purchase the decedent's stock *at its fair value* as of December 31 preceding the death; that the buyer had the option of paying the purchase price, i.e., ½ the net worth of the business, *in instalments* of *"at least"* $150 a month over a period of 15 years, or of paying the purchase price at once *in cash,* in which event he was only required to pay 33⅓% of the net worth instead of 50%; and that a further privilege was accorded the buyer, if instalment buying was selected, of accelerating payment, in which event, the buyer was only obliged to pay 40% of the net worth, with a credit allowed for all instalment payments theretofore made. Defendant contends that his obligation to pay the consideration, by his election, consists solely as provided in Article 2(a) of the agreement, to wit: "at least $150 per month for a period of 15 years." He regards this language as clear, precise and understandable, without ambiguity, requiring no construction or interpretation. The learned court below, accepting this construction, sustained the preliminary objections and dismissed the bill. This appeal followed.

We are unable to adopt defendant's interpretation. This "home made" agreement made by two business men must be construed in a business sense and in accordance with the understanding and interpretation of business men. Greater latitude is indulged in construing an instrument which is prepared by a draftsman who is a layman or unskilled than in a case in which the instrument is prepared by a skilled draftsman. 17 C. J. S., Contracts, §294 at p. 686.

If we were to adopt the defendant's contention and regard the words of Clause 2(a) separately and not in connection with the *whole agreement* we would reach an absurd or unnatural result. First: the words "at least $150.00 . . ." would assume a minimum with no provision for determining a maximum except for the gratu-

ity of the survivor. By payment under option (a), interpreted according to the defendant's theory, the defendant would pay $150.00 a month for 15 years, a total of $27,000.00; but if he elected to pay cash, instead of by instalments he would be required to pay 33⅓% of the *net worth* of the corporation assets as of the preceding December 31st, a total of about $60,000.00. Thus under defendant's construction he would pay ⅓ of the net worth of the business or $60,000 if paid for at once, but only $27,000 or less than one-sixth of the value of the business (one-third of decedent's half-interest) if paid in instalments of only $150.00 per month over the extended period of 15 years. Considering the value of $27,000 available for present investment purposes as contrasted to the same sum payable over a 15 year period it is clear that the share to be received by the widow, according to defendant, would have a present value of about only one-sixth of decedent's one-half interest in the business. It is inconceivable that the survivor would, in such circumstances, elect to pay under option (b). The absurdity of defendant's position is further emphasized when it is observed that if defendant, having elected to accept option 2(a) desired to pay the balance in cash, he might do so by paying "40% of the net worth", *calculated as above,* less credit for all instalments paid. Assuming such net worth to be $180,000, the purchase price at 40% would then be $72,000 instead of $27,000. The result of defendant's interpretation, in summary, is: if payment is in instalments the price is $27,000; if in cash $60,000, and if in anticipation or acceleration of instalments $72,000. There is nothing in the present state of the record to indicate that these figures, as of the December 31st preceding decedent's death, are not also similar to those which existed in 1943 when the agreement was drafted. The agreement must, of course, be construed with reference to the intention of the parties as of the time it was entered into: *Percy*

*A. Brown & Co. v. Raub,* 357 Pa. 271, 287, et seq., 54 A. 2d 35; *Davidson v. Von Lingen,* 113 U. S. 40, 50, 5 S. Ct. 346, 28 L. Ed. 885.

There is no doubt that the theory of the defendant, adopted by the court below, yields an unusual and absurd result. The rule is familiar that where there is an ambiguity in a contract a proposed interpretation which yields an inequitable, absurd or unusual result is, if possible, to be avoided: *Hempfield Township School District v. Cavalier,* 309 Pa. 460, 164 A. 602; *Percy A. Brown & Co. v. Raub,* 357 Pa. 271, 287, 54 A. 2d 35. Where parties, sui juris, enter into an *unambiguous* agreement, with knowledge of the facts, the courts will not relieve them of their contractual obligations because of the questionable wisdom of the bargain: *Owens v. Wehrle,* 14 Pa. Superior Ct. 536; nor will the court reconstruct a contract for the parties: see generally 12 Am. Juris., Contracts, Section 228. However, if the language of the contract is ambiguous we must examine the *entire document* to determine the intent of the parties. Though we do not relieve parties from the effect of an improvident contract, we also do not allow a rigid literalness to be used in creating an improvident contract for them against their intent.

We turn, therefore, to the major question of whether or not there is an ambiguity in this contract. The only dispute is as to what amount is due and payable monthly if the survivor elects to take advantage of the 15 year payment plan. The crucial words in the agreement at bar are *"at least."* The appellant contends and the court below held that "at least $150.00" was intended to establish a fixed and unvarying amount under option (a), though, as we have shown, such construction actually makes the choice so obvious that any idea of balanced options is negated. The learned chancellor in the court below stated, "In the instant case the words

'at least' relate as well to the frequency of the payment as to the amount and the period during which it is to continue; the intention of the parties evidently being the protection of their dependents for the first few years after the decease of the parent and husband." We think it is beyond debate that the words "at least" relate primarily to the amount $150.00; these words cannot be weakened by having them purport to relate to other factors; the frequency of payment was fully and adequately described by the words "per month," the period is clearly set forth by the words "for a period of 15 years." The chancellor proceeded to examine the question of vagueness citing and analyzing *Specker v. Sun Ray Drug Co.*, 163 Pa. Superior Ct. 39, 60 A. 2d 400; *Gastley v. American Stores Co.*, 63 D. & C. 482; *Clarke v. Clarke*, 7 D. & C. 35, and *Gregg's Estate*, 213 Pa. 260, 62 A. 856. This analysis was correct so far as it went in rejecting the contention that the contract failed because of indefiniteness. But such cases are not authority for the proposition that the words "at least" can therefore be ignored. The construction advanced by the lower court and the appellees simply *deletes* the words. The court below assumed that the parties intended set payments at $150 and then referred briefly to the rule whereby parties sui juris are bound by improvident contracts. If, as the lower court stated, the parties intended a payment of $27,000 "at the rate of $150.00 per month for a period of 15 years," that purpose could have been completely and clearly accomplished by omitting the words "at least."

It is well settled doctrine that a contract must be construed as a whole, and the intention of the parties is to be collected from the *entire* instrument and not from detached portions, it being necessary to consider all of its parts in order to determine the meaning of any particular part as well as of the whole. Individual clauses and particular words must be construed in connection

with the rest of the agreement, and all parts of the writing, and every word of it, if possible, will be given effect. 13 C. J. §486, p. 525; *Stewart's Administrators v. Lang*, 37 Pa. 201; *Berridge v. Glassey*, 112 Pa. 442, 3 A. 583; *McMillin v. Titus*, 222 Pa. 500, 72 A. 240; *Knickerbocker Trust Co. v. Ryan*, 227 Pa. 245, 75 A. 1073. The definiteness of the contract having been established the court should have proceeded to the meaning of the words in total context. What is the measuring rod, if any, against which "at least" is to be measured?

In *Specker v. Sun Ray Drug Co.*, 163 Pa. Superior Ct. 39, 60 A. 2d 400, there was an oral promise "that the salary and bonus plans would be continued as good as, and if possible better than, in the past." The court upheld the agreement against a contention of vagueness and stated that a minimum amount was definitely fixed. There was no question, as here, as to how a higher amount was to be determined. Fixing a minimum payment is not necessarily also the fixing of the maximum; the word "only" cannot be arbitrarily substituted for the words "at least," as the appellee contends. The cases (*Chamberlain v. Board of Commissioners of City of Mobile*, 243 Ala. 662, 11 So. 2nd 724, and *Warren Mfg. Co. of Baltimore v. William H. Hoffman*, 62 Md. 165) cited by appellee, indicate that the words "at least," in context and under certain circumstances, can mean "at most" or "no more than" but an examination of the facts of these cases shows that they are of no help whatsoever in construing the contract in the case at bar. Whether the words "at least" establish a minimum without regard to a higher or greater figure must depend on the circumstances of each individual case: compare *Com. v. Brown*, 210 Pa. 29, 33-35, 59 A. 479. If a longer period or greater amount is implied, we must look to the contract to see how such longer period or greater amount is to be determined, e.g., by lodging discretion with commissioners as

in the *Brown* case or by looking to a fluctuating value of stock, as in this case.

In *Roberts v. Wilcock*, 8 W. & S. 464, there was a grant of a cartway "8 feet wide at least" and it was held that the grantee could take more than 8 feet if necessary for the use as a cartway. It is clear that the words "at least" there marked an irreducible minimum and the maximum was to be determined by the nature of a cartway. In the instant case there was also provided a minimum and the maximum was to be measured by the real value of the stock on the December 31st preceding the death of one of the co-owners. The court below dismissed this case saying, "That decision would appear to be the obvious meaning of the phrase 'at least' under the circumstances in that case, but cannot be of any help to the plaintiffs in the case at bar." No distinction is pointed out. In the *Roberts* case, at page 470, Chief Justice GIBSON stated, "What then is the effect of the words 'at least'? To bind it to the expression of an exact quantity, would be to give them no effect at all; for an exact quantity would have been more certainly expressed without them. It will not be said that the words 'eight feet wide *at least*' are as definite as the words 'exactly eight,' which express no more than would be expressed by the words 'eight feet,' without an adjunct, which can serve no purpose but to qualify a meaning positively expressed without it. The words 'at least,' therefore, must be allowed to have a meaning; and it is not hard to assign an obvious one to them. While they express that the width of the passage shall not be less than a given measure in any event, they distinctly imply that it may be more. This conclusion is unavoidable, unless we assume that they express a definite quantity; and to do so would bring the construction into collision with the rule just stated. But it is seen at a glance that they import uncertainty; and it is obvious on which side the uncertainty lies."

If then the co-owners intended to set a minimum and also intended to provide for higher payments what was the measuring rod whereby such payments would be calculated? The answer lies in the obvious; indeed, it was probably because the measure of the payments was so obvious that the parties omitted to state it more explicitly. The measure of the monthly payments was to be the decedent's interest in the business which he was selling to the survivor. The decedent's interest is fixed by repetition of reference to the net worth of the business as of the preceding December 31st. The measure of net worth, in turn, is described as the value of the "real and personal property of the . . . company." The parties were thinking in terms of assets, of divisible property, of things they owned jointly— there was no need to conjecture as to value. Paragraph 2 significantly provides that the survivor is given "the option to pay for [*the stock*] by either of the following methods:" (italics supplied). The agreement when recognized as such sale imports the understanding that the survivor is to pay for what he gets, no more or less. It would be unusual for businessmen to fix, for a more or less distant future, the value of their interests in a going business.

It must be elementary that the parties understood and intended that the amount payable over a 15 year period should be greater than that payable immediately in a single lump sum. Paragraph 4 would not have provided a period of one year for the making of a mere mathematical computation. The only way in which the creation of the options could require such lengthy consideration would be if the survivor had to decide whether to liquidate a one-half interest over a period of 15 years or to pay one year after death the value of a one-third interest in a lump sum.

We are convinced that, unless the defendant can show otherwise, the parties intended, and it is suffi-

ciently expressed, that the survivor, under option (a) pay one-half of the net worth of the business in payments of not less than $150.00 per month or under the (b) alternative he could pay one third of the net worth of the business in one lump sum. Into this pattern paragraph 3 fits logically being less in time and greater in amount than option (a) and greater in time and less in amount than option (b). The measuring rod for determining the amount of the monthly payments is the value of the stock forming the subject matter of the sale, i.e., the real and personal assets of the business, being its net worth.

The plaintiff's bill of complaint should not have been dismissed on preliminary objections. It is clear that a contract when ambiguous is to be interpreted in the light of the surrounding circumstances. A disposition of the matter without permitting full development of the circumstances is premature. The rule is that a summary judgment or decree will not be granted unless a case is clear; if the case is not clear the parties must have an opportunity to develop the facts at trial: *Ottman v. Nixon-Nirdlinger*, 301 Pa. 234, 243-244, 151 A. 879; *Smith v. Brockway Motor Truck Corp.*, 302 Pa. 217, 219-220, 153 A. 333. Among the controlling facts necessary to construe the instrument are the value of the business when the *contract* was entered into. This may aid in determining the intention of the parties. If it shows that the net worth of the business in 1943 was $81,000, one-third of which is $27,000, the present inequity may become unimportant. We should also know the average monthly earnings of the business in 1943, the nature of the business, the character of its assets, the amount of original capital investment, and all other pertinent information. The defendant should be required to answer.

The decree sustaining the preliminary objections and dismissing the bill of complaint is reversed, the bill is

reinstated, and defendant is directed to answer, and upon issue being joined, after a hearing, the court below is directed to enter an appropriate decree. Costs to abide the event.