521 A.2d 433

**Kenneth J. SPARLER, Appellant,**

**v.**

**FIREMAN'S INSURANCE COMPANY OF NEWARK, NEW JERSEY, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 24, 1986.

Filed Feb. 4, 1987.

Reargument and Clarification Denied March 5, 1987.

598

William B. Anstine, Jr., York, for appellant.
Rebecca N. Tortorici, York, for appellee.

Before CIRILLO, President Judge, and CAVANAUGH, WICKERSHAM, ROWLEY, WIEAND, OLSZEWSKI, DEL SOLE, POPOVICH and JOHNSON, JJ.

WIEAND, Judge:

In this amicable action for declaratory judgment, submitted on an agreed statement of facts, the trial court was asked to determine whether Fireman's Insurance Company of Newark, New Jersey (Fireman's) was liable to its insured, Kenneth J. Sparler, for underinsured motorist coverage. The trial court entered judgment in favor of the insurance company, and Sparler appealed. We affirm.

The agreed statement of facts disclosed that Sparler had sustained personal injuries as a result of an intersectional, vehicular accident in which a vehicle operated by Thomas Garber had violated the mandate of a stop sign. Sparler's losses were in excess of forty thousand ($40,000.00) dollars. He settled his claim against Garber for twenty-five thousand ($25,000.00) dollars, this being the limit of the liability of Garber's insurance carrier under the terms of its policy. In connection with the settlement, Sparler and his wife executed a general release. Sparler then made a claim against Fireman's, his own insurance carrier, for underinsured motorist benefits. Fireman's denied liability. The parties thereafter commenced an amicable action for declaratory judgment, requesting the trial court to determine whether the insurance policy issued by Fireman's rendered it liable to Sparler for underinsurance benefits, and if so, whether the general release executed in connection with the third party settlement operated to bar Sparler's recovery of such benefits from his own insurance carrier. The trial court held that although the insurance policy did establish Sparler's right to recover underinsurance benefits, he was precluded from recovering the same because of the terms of the general release which he had executed when he settled his third party claim. Therefore, judgment was entered in favor of Fireman's.

On appeal, Sparler contends that because the general release which he had executed in favor of the third party tortfeasor was not intended to affect the contractual liability of Fireman's, the release could not operate to bar his recovery from Fireman's of underinsurance benefits. We agree with this contention.

Written releases are construed according to the rules governing the construction of contracts generally. 76 C.J.S. *Release* § 38 (1952). A release normally covers only such matters as can fairly be said to have been within the contemplation of the parties when the release was given. *Estate of Bodnar*, 472 Pa. 383, 387, 372 A.2d 746, 748 (1977); *In re Jones & Laughlin Steel Corp.*, 328 Pa.Super. 442, 456–457, 477 A.2d 527, 534 (1984); *Gateway Center Corp. v. Merriam*, 290 Pa.Super. 419, 425, 434 A.2d 823, 826 (1981). The intention of the parties to a written release is paramount, and in construing a release, a court should adopt an interpretation which, under all of the circumstances, "ascribes the most reasonable, probable and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *General Mills, Inc. v. Snavely*, 203 Pa.Super. 162, 168, 199 A.2d 540, 543 (1964). See: *Unit Vending Corp. v. Lacas*, 410 Pa. 614, 617, 190 A.2d 298, 300 (1963); *Village Beer and Beverage, Inc. v. Vernon D. Cox and Co.*, 327 Pa.Super. 99, 107, 475 A.2d 117, 121 (1984). Although a court will not relieve the parties of the effect of an improvident contract, it must not allow a "rigid literalness" to be used to create an improvident contract for the parties contrary to their intent. *Mowry v. McWherter*, 365 Pa. 232, 238, 74 A.2d 154, 158 (1950). Thus, the words of a release "should not be construed to extend beyond the express consideration mentioned so as to make a release for the parties which they never intended or contemplated." *Brill's Estate*, 337 Pa. 525, 527, 12 A.2d 50, 52 (1940). See: *Furtek v. West Deer Township*, 19 Pa.D. & C.2d 169, 178, *aff'd*, 191 Pa.Super. 405, 156 A.2d 581, 585 (1959).

The general release executed by Sparler and his wife in the instant case provided as follows:

> That we Kenneth Sparler and Jane Sparler, ... for the sole consideration of Twenty-Five Thousand dollars ($25,-000.00), to us in hand paid, receipt whereof is hereby jointly and severally acknowledged, have remised, released, and forever discharged and ... do hereby remise, release and forever discharge Thomas H. Garber and his ... successors and assigns ... and all other persons, firms, and corporations, of and from any and all claims, demands, rights, and causes of action, of whatsoever kind or nature, arising from or by reason of any and all known and unknown, foreseen and unforeseen bodily and personal injuries, loss and damage to property, and the consequences thereof, resulting, and to result, from an accident which happened on or about the 30th day of April 1983....

These terms were contained in a standard release form. In the blank space provided on the form for the name of the party being released and discharged, the name "Thomas H. Garber" had been inserted. Although the phrase "and all other persons, firms and corporations" appeared in boilerplate print following Garber's name, the release did not otherwise suggest or identify Fireman's as a party being released or discharged. The only reasonable interpretation of the release, when it is considered in light of the circumstances surrounding its execution, is that Sparler did not intend to release Fireman's from its contractual obligation. Fireman's was not a party to the release, did not negotiate to reduce any obligations which it might have had under the policy, and paid no consideration to be released from any such contractual obligations. To interpret the release as discharging Fireman's alleged contractual obligations, under these circumstances, would be to insert a benefit for which no separate consideration was paid and which does not appear to have been within the contemplation of the parties.

The trial court's broad interpretation of Sparler's general release was based upon a decision of the United States District Court for the Eastern District of Pennsylvania in

*Dorenzo v. General Motors Corp.*, 334 F.Supp. 1155 (E.D. Pa.1971), *appeal dismissed*, 474 F.2d 1339 (3d Cir.1973). *Dorenzo*, however, is inapposite to the instant case. There, the party claiming the benefit of the general release was a joint tortfeasor whose alleged liability, like that of the released party, had been premised on a single tortious injury to the plaintiff. Here, however, the party seeking to benefit from the general release is an insurer whose *contractual* liability is separate and apart from the tortious liability of the released tortfeasor.

This is an important distinction. It was recognized both in *Cingoranelli v. St. Paul Fire & Marine Insurance Co.*, 658 P.2d 863, 39 A.L.R.4th 366 (Colo.1983) (en banc) and in *Bailey v. Aetna Casualty and Surety Co.*, 497 S.W.2d 816 (Mo.Ct.App.1973). In *Cingoranelli*, the plaintiff had been injured when the car in which she was a passenger collided with an automobile driven by Bertha Betonski. The driver of the vehicle in which the plaintiff had been riding was insured by St. Paul Fire & Marine Insurance Co. (St. Paul). After the plaintiff had agreed to settle her claim for bodily injury against Betonski, the following release was executed:

"I, Mary Cingoranelli, ... for the sole consideration of twenty-five thousand dollars ($25,000.00), to me in hand paid, receipt whereof is hereby acknowledged, have remised, released, and forever discharged, and ... do hereby remise, release, and forever discharge, Bertha Betonski and ... her ... successors and assigns ... *and all other persons, firms, and corporations*, of and from any and all claims, demands, rights, or causes of action of whatsoever kind or nature, arising from or by reason of any and all known and unknown, foreseen and unforeseen bodily and personal injuries, damage to property, and the consequences thereof, resulting, or to result, from a certain accident which happened on or about the 7th day of April 1975, for which I have claimed the said Bertha Betonski to be legally liable, which liability is hereby expressly denied."

*Cingoranelli v. St. Paul Fire & Marine Insurance Co.,* *supra* 658 P.2d at 864 (emphasis added). Thereafter, the plaintiff filed personal injury protection (PIP) claims against St. Paul under Colorado's no-fault insurance statute. When St. Paul refused payment, the plaintiff commenced an action to recover the PIP benefits. The trial court held that the release of the tortfeasor operated as a total bar to all claims, including that for PIP benefits against St. Paul. The Supreme Court of Colorado reversed, observing that the plaintiff's PIP claims against St. Paul were "fundamentally distinct in character" from her tort claim against Betonski. *Id.* 658 P.2d at 868. The PIP claim, the Court noted, was a direct contractual claim against the PIP insurer. *Id.* 658 P.2d at 867. The only similarities between this claim and the tort claim, the Court said, were purely coincidental; they both arose from an automobile accident, and the ultimate financial responsibility for both rested with St. Paul. *Id.* 658 P.2d at 868. Therefore, the Court held, "an automobile accident victim's general release of a tortfeasor, in the absence of a specific provision which unequivocally includes PIP claims within the terms of the release, does not operate to release an automobile insurer from its obligation to pay PIP benefits to the injured victim." *Id.* 658 P.2d at 869.

The plaintiff in *Bailey* also had been injured as a result of an automobile collision. The plaintiff's medical expenses as a result of the accident were covered by a policy of insurance which had been purchased by her mother from Aetna Casualty and Surety Co. (Aetna). Aetna was notified of the collision and of the medical expenses incurred by the plaintiff but refused to make payment. Meanwhile, the plaintiff executed a general release in which the driver of the other vehicle and "any and all other persons, firms and corporations" were discharged from "any and all claims, actions, causes of action and expense" arising out of the accident. Aetna thereafter argued that as a result of the general release of the driver, it had been discharged from its obligation to pay the plaintiff's medical expenses. The Missouri Court of Appeals disagreed, holding that the re-

lease had not relieved Aetna of its contractual obligation. Recognizing that the intention of the parties was the ultimate test for determining the effect of a release, the Court analyzed the facts underlying the execution of the instrument.

> Aetna was not a party to the litigation giving rise to the Release nor was it privy to the defendant tort-feasors. Its obligation to pay medical expenses to Jacquelyn Bailey [the plaintiff] was then in dispute and her claim in the litigation was not only against different persons but was also in tort as distinguished from the present claim on contract asserted against Aetna.

*Bailey v. Aetna Casualty and Surety Co., supra* at 820. Under these circumstances, the Court concluded, "[i]t would require a degree of judicial agility of which we are incapable, to read into this Release any intention on the part of plaintiff to release her claim for medical expenses against Aetna under its policy of insurance." *Id.*

■ We find the reasoning followed in *Cingoranelli* and *Bailey* to be persuasive and, therefore, we adopt it as our own. We conclude that in the absence of unequivocal language to the contrary, a general release of a third party tortfeasor will not be held to discharge the separate contractual obligation of an insurance carrier to provide underinsurance benefits.

■ In the instant case, the general release executed by Sparler in favor of the third party tortfeasor did not contain language unequivocally discharging Fireman's from its alleged contractual obligation to provide underinsurance coverage to Sparler. Thus, contrary to the conclusion reached by the trial court, any right to underinsurance benefits which Sparler might have acquired by virtue of the contract was not relinquished by the release which he had executed in favor of the third party tortfeasor.

Although the trial court's reasoning regarding the release was incorrect, it does not follow that its order disallowing the recovery of underinsurance benefits must be reversed. We are required to affirm the judgment entered by the trial

court if it was correct for any reason. *E.J. McAleer & Co. v. Iceland Products, Inc.,* 475 Pa. 610, 613 n. 4, 381 A.2d 441, 443 n. 4 (1977); *Gwinn v. Kane,* 465 Pa. 269, 279 n. 12, 348 A.2d 900, 905 n. 12 (1975); *Green v. Juneja,* 337 Pa.Super. 460, 464 n. 5, 487 A.2d 36, 39 n. 5 (1985); *Emerick v. Carson,* 325 Pa.Super. 308, 316 n. 2, 472 A.2d 1133, 1137 n. 2 (1984).

Fireman's argued in the trial court and again on appeal that Sparler was not entitled to underinsurance benefits under the terms of its policy. The trial court concluded, however, that there was coverage and that Sparler was entitled to recover the difference between his expenses of forty thousand ($40,000.00) dollars and the twenty-five thousand ($25,000.00) dollars which he was able to recover from the third party tortfeasor. The amount of this difference, of course, was fifteen thousand ($15,000.00) dollars. This requires that we examine the terms of the policy.

Part 6 of the policy issued by Fireman's provided for "Uninsured (and Underinsured) Motorist" coverage. The amount of the coverage provided was fifteen thousand ($15,000.00) dollars for each person and thirty thousand ($30,000.00) dollars for each accident. The policy provided:

By "uninsured motor vehicle" we mean a land motor vehicle ...

(a) with no bodily injury liability bond or policy applying at the time of the accident.

(b) with minimum legal liability bond or policy applying at the time of the accident as required by law governing the insured auto. However, the minimum is less than the Limit of Coverage of Part 6.

(c) With a bodily injury liability bond or policy applying at the time of the accident which is less than the minimum legal Limit of Coverage where the insured auto is principally garaged.

Another provision pertaining to underinsured motorist coverage is found in Subdivision D of Part 6 as follows:

Any amounts payable under Part 6 shall be reduced by all sums

(a) paid because of bodily injury by or on behalf of someone who may be liable.

 Subparagraph (a) of the definitional section by its terms has application to an "uninsured" motor vehicle and not to a vehicle which is "underinsured." It is subparagraphs (b) and (c), rather, which refer to a third party vehicle which, although insured, is underinsured. The third party vehicle was not "underinsured" according to subparagraph (b), because, as the parties have agreed, Sparler received from the third party tortfeasor's insurance carrier a sum greater than the "Limit of Coverage of Part 6" of the Fireman's policy. Because the parties have not stipulated as to the place where the third party vehicle was "principally garaged," however, we are unable to know whether that vehicle, although insured, was underinsured within the meaning of subparagraph (c).[1]

1. By thus interpreting the policy, we do not suggest that the terms "uninsured" and "underinsured" can be used interchangeably. We conclude merely that where, as here, the expressed intent of the parties to an insurance contract is to subsume the definition of "underinsured motor vehicle" within a contractual provision which purports to define "uninsured motor vehicle," it is necessary to look to that provision in order to ascertain the meaning of the term "underinsured motor vehicle." The policy issued by Fireman's specifically states that "[t]he term uninsured motor vehicle also includes an underinsured motor vehicle." Because the term underinsured motor vehicle is not otherwise defined in Part 6 of the policy, it is necessary to turn for guidance to the definitional section for an "uninsured motor vehicle." That provision contains two subsections, (b) and (c), which obviously do not describe an uninsured motor vehicle, but which provide generally accepted definitions of underinsurance.

The language of a contract should be given its ordinary and usual meaning unless it is clear that some other meaning was intended by the parties. D'Orazio v. Masciantonio, 345 Pa. 428, 432, 29 A.2d 43, 45 (1943); B.F. Goodrich Co. v. Wilson, 337 Pa. 333, 338, 10 A.2d 422, 423 (1940); Rothstein v. Aetna Insurance Co., 216 Pa.Super. 418, 423, 268 A.2d 233, 235 (1970). No provision within a contract is to be treated as surplusage or redundant if any reasonable meaning consistent with the other parts can be given to it. See: General Mills, Inc. v. Snavely, 203 Pa.Super. 162, 168, 199 A.2d 540, 544 (1964). Moreover, legal terms of art, as well as common words of accepted usage, are not to be construed in a manner which would render contractual provisions internally inconsistent. See: Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1013 (3d Cir.1980).

The insurance policy in the instant case was certainly intended to provide underinsurance coverage. According to the terms of the

■ Still, it is clear that Sparler in fact was paid the sum of twenty-five thousand ($25,000.00) dollars by or on behalf of the third party tortfeasor. According to the provision contained in Subdivision D of the policy, the twenty-five thousand ($25,000.00) dollars received by Sparler by or on behalf of the third party tortfeasor must be set off against any amount payable by virtue of the "Uninsured (and Underinsured) Motorist" coverage provided in Part 6 of the policy. When the twenty-five thousand ($25,000.00) dollar recovery is set off against the fifteen thousand ($15,000.00) dollars which Fireman's agreed to pay to Sparler pursuant to Section 6, it becomes evident that Fireman's has no further liability for underinsured motorist coverage.

We conclude, therefore, that Sparler's claim for underinsured motorist coverage has been precluded not because of the terms of the third party release which he executed, as the trial court concluded,[2] but by the very terms of the

agreement, the definition of underinsured motor vehicles was subsumed in the definition of uninsured motor vehicles. To conclude that the policy does not define underinsurance merely because it fails to contain a separate definitional section for "underinsured motor vehicles," would not only be contrary to the expressed intent of the parties, but would make meaningless surplusage of subsections (b) and (c) and of the contractual provision which states: "The term uninsured motor vehicle also includes an underinsured motor vehicle." By looking to the definitional provision for uninsured motor vehicles to ascertain the meaning of the term "underinsured motor vehicle," we are able to interpret the contractual provisions of Part 6 with internal consistency.

2. The trial court also denied recovery on the grounds that Sparler had settled with the third party tortfeasor without Fireman's consent. Such consent was required by a clause in the policy which provided: "We do not cover ... (d) any person if that person ... settles the bodily injury claim without our written consent." In light of our disposition of this case, we need not review the propriety of the court's determination of this issue. We observe, however, that the trial court was not asked by the parties in the action for declaratory judgment to decide this issue. Moreover, the stipulation of facts fails to contain sufficient facts to permit a determination. The statement of agreed facts submitted by the parties to the trial court does not disclose whether Fireman's consented to the third party settlement, or whether, if not, Fireman's was prejudiced by Sparler's settlement of his third party action for policy limits. See: *Roberts v. Fireman's Insurance Co. of Newark,* 376 Pa. 99, 101 A.2d 747 (1954) (release of third party tortfeasor may discharge insurer if the release defeats or

policy itself. Because Sparler's third party recovery was in excess of and had to be set off against the underinsured motorist coverage provided by Fireman's policy, the judgment entered in favor of Fireman's was proper and must be affirmed.

Affirmed.

POPOVICH, J., files a concurring opinion.

JOHNSON, J., files a concurring opinion in which CAVANAUGH, J., joins.

DEL SOLE, J., files a concurring and dissenting opinion.

POPOVICH, Judge, concurring:

I concur only in the result, for I believe the Majority has gone astray in its analysis.

The scope of contractual accountability has been recently expounded upon by our Supreme Court in *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563 (1983). There, the high court unequivocally wrote that where the terms of an agreement are clear, precise and free from doubt, the signators are bound by its language.

Instantly, Sparler signed a release, in exchange for $25,000 received from a third party tortfeasor, which contained language exonerating not only the third party from further liability but insulated "all other persons, firms and corporations" from exposure because of the execution of the release.

Sparler, being a party to the agreement, could have very easily deleted the language which precipitated the instant declaratory judgment. His failure to excise the wording is now being condoned and viewed with favor by this Court as

impairs insurer's right of subrogation; a key consideration in determining liability is whether insurer had knowledge of release). See also: *Bradford v. American Mutual Liability Insurance Co.*, 213 Pa.Super. 8, 245 A.2d 748 (1968); *Murphy & Co. v. Manufacturers' Casualty Co.*, 89 Pa.Super. 281 (1926).

a mere adoption of a position espoused by two of our sister states distinguishing contractual liability from tortious liability as the foundation for holding the insurer liable because of not being a party to or a beneficiary of the agreement. But for the conclusion that the insurer's set-off clause rendering payment to the plaintiff unnecessary, the insurer would be held responsible for payment.

I find the issue to be a straightforward one. The contract signed by Sparler is not unenforceable because of either a latent or patent ambiguity. Nor is there an allegation that a mistake of fact induced the plaintiff to sign the instrument in question.

To side-step the obligations flowing from the contract, in the face of an otherwise lucid agreement, would be contrary to established principles of contract law requiring that an individual be bound by the terms of an agreement, i.e., *pacta sunt servanta.* Restatement (Second) of the Law of Contracts, Vol. 2, at page 309; *Standard Venetian Blind,* supra.

Moreover, the Majority's approach to giving effect to the release, save for the verbiage relating to "firms and corporations" being insulated from further liability, is the equivalent of giving only partial effect to the terms of the entire agreement and renders the quoted language pure surplusage. There is no indication that such was the intent of the plaintiff. To do so is mere speculation and surmise.

If a portion of the release is to be neutralized on the ground that it was not the intent of the plaintiff to excuse the insurer from responsibility for paying a claim filed by the plaintiff following the signing of a release, then such a rationale carried to its logical conclusion should hold the entire agreement invalid and not merely portions of it.

To this writer, the agreement contains verbiage which encompasses the insurer and, thus, should be given its clear, unambiguous and lucid meaning. Resorting to the intent of the parties is only necessary where the language to the agreement is ambiguous and subject to multiple interpretations. See Corbin on Contracts § 538.

Further, the Majority attempts to avoid the obvious consequences of the release by arguing that the insurer was *not* a party to its terms and, therefore, should not be considered to have been a beneficiary of the release. However, the insured's ability to subrogate the claim would be precluded by the release signed by Sparler, an interest which surely would not be advanced by our holding this day, and is ameliorated only by the fact that Sparler's recovery under the release forecloses his recoupment of any additional monies from the insurer because of a set-off clause in the policy.

Thus, given the Majority's ultimate ruling denying the claimant's right to recovery on grounds of set-off under the contract itself, with which I agree, I concur in the result only.

JOHNSON, Judge, concurring:

I agree with the majority that Sparler's third party recovery was in excess of, and had to be set off against, the underinsured motorist coverage provided by Fireman's policy. *Haegele v. Pennsylvania General Ins. Co.*, 330 Pa.Super. 481, 490–93, 479 A.2d 1005, 1010–11 (1984); *Votedian v. General Acc. Fire & Life Assur. Corp.*, 330 Pa.Super. 13, 19–20, 478 A.2d 1324, 1328 (1984). I also agree that we are required to affirm the trial court's judgment if it was correct for any reason.

Since the amount of the third party recovery exceeded the amount Fireman's agreed to pay, Fireman's has no further liability and that should end the matter. I, therefore, would not reach or seek to determine whether a general release of a third party tortfeasor would discharge the obligations of an insurance carrier under its policy.

CAVANAUGH, J., joins.

DEL SOLE, Judge, concurring and dissenting:

I join the Opinion by my distinguished colleague, Judge Donald E. Wieand, insofar as it reviews the effect of a written release executed in favor of a tortfeasor and how

that release would apply to contractual claims arising under an insurance policy issued to the releasor.

With the greatest respect to my colleague, Judge Popovich, I believe that his analysis, if accepted, would represent a drastic change in the law of Pennsylvania. Certainly, one could extend his analysis to claims against accident and health insurers, hospitalization carriers and others similarly situated because of the nature of the language in the third party tortfeasor release. Since this is not, and never has been, the law of the Commonwealth, I believe that Judge Wieand's Opinion correctly disposes of the release issue.

My disagreement with the majority Opinion centers on its discussion of underinsurance coverage in this case. First, it must be pointed out that there is no clear cut definition of the term "underinsured motorist" within the policy issued by the defendant. Rather, the policy states: "[t]he term 'uninsured' also includes an underinsured motor vehicle." Absent any definition of "underinsured" in the terms of the policy, the majority refers back to the definition of the term "uninsured" in its analysis. The policy states:

By "uninsured motor vehicle" we mean a land motor vehicle ...

(a) with no bodily injury liability bond or policy applying at the time of the accident.

(b) with minimum legal liability bond or policy applying at the time of the accident as required by law governing the insured auto. However, the minimum is less than the Limit of Coverage of Part 6.

(c) with a bodily injury liability bond or policy applying at the time of the accident which is less than the minimum legal Limit of Coverage where the insured auto is principally garaged.

The record clearly reveals that the vehicle involved in the collision with the Appellant was not an uninsured motor vehicle as that term is defined in subparagraph (a). The stipulated set of facts indicate that Appellant received the policy limits on the vehicle. Accordingly, I agree with the majority that the vehicle was insured and therefore subpar-

agraph (a) does not apply. Likewise, I agree with the Majority's finding that under the facts presented in this case subparagraph (b) does not apply.

With regard to (c) the majority improperly concludes that we need to know the state of residence of the third party vehicle. The majority in arriving at this conclusion misreads the term "insured auto". The term "insured auto" used by defendant in the policy, is clearly defined on page 4 of the policy as the vehicle shown on the Coverage Data Page, a newly acquired vehicle, a trailer, or a temporary substitute vehicle. The insured auto in this case is Appellant's vehicle which is principally garaged in the Commonwealth of Pennsylvania. Thus, the majority's conclusion that we cannot determine whether there was coverage since we do not know where the third party tortfeasor's vehicle was garaged, is incorrect. The location where the third party tortfeasor's vehicle is garaged is of no import relative to the definition of uninsured motorist as provided in the instant policy.

Not only do I believe the Majority incorrectly interpreted the language of subsection (c), but in my view neither subsections (a), (b) or (c) apply to the question at hand. The issue in this case in its simplest form is whether or not there was *underinsured* motorist coverage under the terms of this policy and, if so, how would that provision apply in this case. The policy itself does not provide a definition of "underinsured vehicle". *Compare Votedian v. General Acc. Fire & Life Assur.*, 330 Pa.Super. 13, 478 A.2d 1324 (1984) ftn. 1 (where the policy at issue defined the term underinsured vehicle.) As recited, the only applicable language in the policy states: "The term uninsured motor vehicle also includes an underinsured motor vehicle.". Unlike the majority I do not read this statement to provide that the terms uninsured and underinsured can be used interchangeably. The terms refer to two distinct situations. In *Votedian v. General Acc. Fire & Life Assur.*, supra., this court held:

Underinsured motorist coverage is not the same as uninsured motorist coverage. The Uninsured Motorist Coverage Act does not require underinsured motorist coverage ... Our legislature did not intend to provide additional insurance to those who although they suffered severe injury had recourse to at least the legal minimum of insurance through the other motorist.

The legislature has not by statute established a policy which compels the writing of underinsured motorist coverage.[3] An insurance company is wholly free to issue a policy of automobile liability insurance which contains no protection whatsoever against underinsured motorists. Although companies, for an additional premium, may undertake to write such coverage, the underinsured motorist feature is purely optional. An insured may purchase such coverage or he may decline to pay the premium charged therefor and accept a policy which contains no such coverage. When underinsured motorist coverage is included, the terms and limitations thereof are not controlled by statute or by public policy but by the agreement reached by the parties. That agreement, as expressed in the policy of insurance, may place limitations upon underinsured motorist coverage, subject only to the requirement that the limitation be clearly worded and conspicuously displayed.

[3.] The Motor Vehicle Financial Responsibility Law, enacted February 12, 1984 and effective October 1, 1984, requires that future motor vehicle liability insurance policies contain both uninsured and underinsured motorist coverage. See: 75 Pa.C.S. § 1731(a).

330 Pa.Super. at 18–19, 478 A.2d 1324. (citations omitted).

In the policy issued by defendant uninsured and underinsured motorist coverage is provided in Part 6, yet the term underinsured is not defined in the glossary or in Part 6. To the average individual the term underinsured motorist coverage obviously would refer to a situation where a third party tortfeasor lacks sufficient insurance limits to satisfy the insured's claim and the insured is able to collect the difference from its carrier up to the limits of the policy. Even the general assembly in the new Act defines an

underinsured motor vehicle as "[a] motor vehicle for which the limits of available liability insurance and self-insurance are insufficient to pay damages." 75 Pa.C.S.A. § 1702. If the defendant wished to proscribe a different definition to the term "underinsurance" than what is commonly used, the defendant should have specifically and clearly given such a definition in the agreement. Under the instant policy the insured is lead to believe he is being afforded the extra protection of underinsurance coverage, however the majority would rule that the definition which the policy provides for the term uninsured also applies to the term underinsured. The majority would find the coverage to be one in the same. I cannot subscribe to the majority's interpretation which would, in defining the term underinsured, deviate from the generally accepted definition and which would do so absent a clear indication in the policy of such an intention.

Turning to the "set-off" provision contained in the policy, we find:

> *Any amounts payable* under Part 6 shall be reduced by all sums:
>
> (a) paid because of bodily injury by or on behalf of someone who may be liable. (Emphasis added).

The majority interprets this language and concludes that Appellant, who has received $25,000.00 from the third party tortfeasor which amount is in excess of the coverage limits, is not entitled to $15,000.00 due to this set-off language. In *Votedian*, the set-off provision stated: " 'limit of liability shall be reduced ...' by payments made". *Votedian v. General Acc. Fire & Life Assur.*, 330 Pa.Super. at 20, 478 A.2d 1324. The court in *Votedian* found this language to be clear and unambiguous and to require the Appellees $30,000.00 liability limits to be reduced by the sum previously paid on behalf of the tortfeasor legally responsible for Appellees damages. The policy in the instant case provides a set-off for "amounts payable under Part 6" unlike the policy in *Votedian* which required a set-off from the "limits of liability". While the "limits of liability" in this case are

$15,000.00, the "amounts payable under Part 6" are defined in part 6 B of the policy which provides:

*We will pay damages which a Covered Person is legally entitled to recover* from the owner or operator of an [underinsured] motor vehicle because of bodily injury

(a) sustained by a Covered Person; and

(b) caused by an accident.

(Emphasis added.)

In contrast to *Votedian* the set-off in this case is to be taken from the *damage* figure, not the figure which represents the limits of liability.

The parties have stipulated that the insured's damages were in excess of $40,000.00. Under the terms of the policy, this amount "shall be reduced by" $25,000.00, the sum paid by the third party tortfeasor. In this case the difference of $15,000.00 equals the liability limits under the policy and, therefore, I believe Appellant is entitled to collect $15,000.00 from the carrier under the terms of the policy.