ERIE TELECOMMUNICATIONS, INC., Appellant,

v.

CITY OF ERIE, PENNSYLVANIA, Appellee.

No. 87–3648.

United States Court of Appeals, Third Circuit.

Argued April 11, 1988.

Decided July 28, 1988.

David J. Saylor (argued), Robert Corn–Revere, Hogan & Hartson, Washington, D.C., James D. McDonald, Jr., Gary Eiben, The McDonald Group, Erie, Pa., for appellant.

T. Warren Jones, James R. Walczak (argued), Dale E. Huntley, MacDonald, Illig, Jones & Britton, Erie, Pa., for appellee.

Stefan Presser, Legal Director, ACLU of Pennsylvania, Philadelphia, Pa., for amicus curiae ACLU of Pennsylvania.

Joseph Van Eaton (argued), Spiegel & McDiarmid, Washington, D.C., Michael I. Meyerson, University of Baltimore School of Law, Baltimore, Md., for amici curiae Albert S. Richardson, OC/UCC and Alliance for Communications Democracy.

L. Andrew Tollin, Wilkinson, Barker, Knauer & Quinn, Washington, D.C., for amici curiae The Media Institute.

Henry L. Baumann, Benjamin F.P. Ivins, National Ass'n of Broadcasters, Washington, D.C., for amicus curiae Ass'n of Nat. Broadcasters.

J. Laurent Scharff, Jack N. Goodman, James M. Smith, Pierson, Ball & Dowd, Washington, D.C., for amicus curiae Ass'n of Independent Television Stations, Inc.

Before HUTCHINSON, SCIRICA and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

Appellant Erie Telecommunications, Inc. ("ETI") commenced this action in the United States District Court for the Western District of Pennsylvania against the City of Erie, Pennsylvania ("City"), challenging the validity of a franchise agreement and a related side access agreement entered into by the parties in 1980. The agreements, each for a term of ten years, awarded ETI a cable television franchise in exchange for an initial payment of $3 million, in addition to various other types of consideration.

In the district court, ETI claimed that the franchise and access agreements violated ETI's first amendment right of free expression because they imposed a money- and content-based prior restraint on ETI and because they singled out ETI from other members of the media in a discriminatory manner. ETI also claimed that the franchise and access agreements violated its fourteenth amendment right to equal protection under the law by impermissibly burdening its exercise of a fundamental right. The district court rejected ETI's claims, and thus upheld the validity of the agreements between ETI and the City.

On appeal, ETI raises the same constitutional claims it raised before the district court. In addition, ETI now argues that the district court erred in holding that the 1980 franchising process estopped ETI from raising claims under the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 *et seq.* (Supp. II 1984) ("Cable Act") and FCC regulations.

We have reviewed the record in this matter and are satisfied that ETI's execution of a Mutual Release and Covenant in January 1984[1]—in which ETI agreed that the

---

[1]. The Mutual Release and Covenant was entered into as part of a settlement of litigation between

franchise agreement was "valid, binding and of full force and effect," and agreed to release the City from "any and all claims . . . relating to . . . the Franchise"—is dispositive of this case. We therefore find it unnecessary to reach the constitutional and estoppel claims asserted by ETI and will affirm the order filed by the district court on August 4, 1987, as amended by the district court's order dated September 3, 1987.[2]

## I.

In 1979, the City of Erie began to investigate and publicly discuss the idea of granting a cable television franchise to a cable operator as a means of raising revenue for the City. Within one year, the City hired a professional consultant to aid it in preparing a comprehensive cable television ordinance and in negotiating a franchise agreement. On April 1, 1980, the City enacted an ordinance outlining the terms that would be required of potential cable operators and issued a formal "Request for Proposals." Six cable television companies responded to the request.

In June 1980, ETI, whose principal shareholder is American Television and Communications Corporation ("ATC"), the nation's second largest cable operator, submitted its proposal to the City, offering the sum of $675,000 in prepaid franchise fees and five percent (5%) of ETI's gross revenues over the ten year life of the franchise. ETI later revised its proposal by raising its prepayment of fees to $900,000, and ultimately agreed to make a prepayment of $2,700,000. After public hearings were held, at which each of the six cable compa-

nies offered a proposal, the Erie City Council selected ETI and Teleprompter of Erie, Inc., ("Teleprompter"), one of ETI's competitors, as the two companies with which the City would engage in final negotiations. On October 29, 1980, the City awarded the City's cable franchise to ETI.

Shortly thereafter, on November 11, 1980, the City and ETI entered into the franchise agreement and a related access agreement,[3] both of which were to remain in effect until December 1990. The franchise agreement contained various prepayment and future fees provisions and provided, in section 29(A), that:

> As compensation for permission to use the streets and public ways of the City for the construction, operation, maintenance, modification and reconstruction of a Cable System, and for the City's costs in establishing a regulatory program for Grantee [ETI], the Grantee shall pay to the City an annual amount equal to five percent (5%) of the Grantee's Gross Annual Receipts, until disapproved by the FCC.[4]

App. at 373. The district court described the details of the franchise agreement as follows:

> The agreement provides for the satisfaction of this 5% assessment through two distinct means. Under § 29(D)(1), prepayment of those fees required under § 29(A) was due in the amount of $2,700,000. Further, under § 29(D)(2), a minimum of $100,000 per year or the 5% assessment, whichever was greater, is due for each year the agreement covers. However, no payment greater than $100,-000 was due until all prepaid franchise

the City and Teleprompter of Erie, Inc., a cable television company that competed with ETI for the franchise agreement that gives rise to this appeal. This prior litigation is discussed *infra.*

**2.** In affirming the district court's orders, we do so without prejudice to ETI's right to renew its claim for the "time value" of its $2,700,000 prepayment, as discussed in Part V, *infra.*

**3.** "Access" programming is local programming by individuals or groups that wish to comment on public, educational, or governmental issues of interest to the community. The access agree-

ment contains terms governing ETI's provision of a number of its channels for such programming. *See Erie Telecommunications, Inc. v. City of Erie,* 659 F.Supp. 580, 582 n. 3 (W.D.Pa.1987).

**4.** On November 11, 1980, the date on which ETI was given the City cable franchise, and until the effective date of the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521–611 on December 29, 1984, Federal Communications Commission regulations placed a three percent (3%) of gross revenues cap on franchise fees. The Cable Act raised the three percent (3%) cap to five percent (5%). *See id.*

fees had been recovered by ETI. Moreover, a $150,000 fee was imposed for direct and indirect expenses incurred by the City in the franchising process and an additional $150,000 fee became due as compensation for the City's aid in securing space for ETI's cables on existing utility poles.

*Erie Telecommunications, Inc. v. City of Erie,* 659 F.Supp. 580, 583 (W.D.Pa.1987).

The franchise and access agreements also contained provisions regarding access requirements. The franchise agreement called for provision of "in-kind" dedicated channel capacity and television production equipment and training by ETI. The access agreement contained the fee structure for the provision of access channels. These provisions, taken together, required ETI to make a prepayment of $30,000 and subsequent payments of $90,000 during the first year of the franchise term, $10,000 per month for the first three years, and $25,000 per year for the remainder of the agreement term. In addition, subject to certain qualifications, the access agreement required ETI to pay one percent of its gross receipts for use in access programming. After the agreements had been signed, ETI made a $3 million payment to the City and installation of the cable system commenced.

In January 1981, Teleprompter, the cable company that had been outbid by ETI and thus had not been granted the right to enter into a cable franchise agreement with the City, filed suit against ETI and the City in the United States District Court for the Western District of Pennsylvania, claiming that ETI's franchise agreement with the City was invalid. *See Teleprompter of Erie, Inc. v. City of Erie,* 537 F.Supp. 6 (W.D.Pa.1981).[5] In January 1984, the Teleprompter litigation was settled by Judge

Weber's entry of a Consent Order and the execution of a "Mutual Release and Covenants" by Teleprompter, ETI and the City. App. at 812.[6]

In the release, all parties, including ETI, agreed that the franchise agreement was "valid, binding and of full force and effect." App. at 816. The parties also agreed to "... release, remise, quitclaim, and forever discharge the City of Erie ... from any and all claims ... relating to ... the Franchise...." *Id.* at 819.

In April 1985, ETI discontinued payment of franchise fees to the City and brought suit challenging the validity of the franchise agreement, the access agreement, and the City's cable television ordinance. In its Amended Complaint, ETI sought injunctive and declaratory relief, as well as damages and the repayment of excess franchise and access fees tendered to the City. App. at 200–31.

In the district court, the City raised numerous affirmative defenses. The City's primary defenses fell into three categories. The City argued first that because ETI freely entered into the franchise and access agreements, ETI was precluded, under the doctrines of waiver and estoppel, from challenging the legality and enforceability of those agreements. The City next asserted that ETI's position in the *Teleprompter* case—in which ETI defended the propriety of the bidding process—should estop ETI from asserting that the franchise agreement was invalid or unenforceable. Finally, the City argued that ETI's claims for damages under 42 U.S.C. § 1983 were barred by the statute of limitations. The City also counterclaimed for breach of contract and for fraud.

In reviewing the City's motion for partial summary judgment and ETI's cross motion for summary judgment, the district court

---

**5.** The record on appeal does not contain the complaint filed in the *Teleprompter* litigation and thus does not disclose the precise claims brought by Teleprompter against ETI and the City. It does, however, contain a newspaper clipping which states that Teleprompter's suit charged ETI and the City with "violations of federal anti-racketeering laws and state ethics codes, abuse of public office, political corruption, and of depriving Teleprompter of due pro-

cess rights under the 14th amendment of the U.S. Constitution." App. at 1035.

**6.** The Consent Order was also signed by Westinghouse Electric Company, which is Teleprompter's parent company, and American Television and Communications Corporation, which is ETI's parent company.

rejected all but one of the City's affirmative defenses. First, the district court concluded that "ETI's entering into the franchise agreement neither constitutes a waiver of nor a ground for estopping the assertion of the instant constitutional claims." 659 F.Supp. at 584. It reached that conclusion on the basis of its finding that in 1980, when the franchise agreement was signed, there was considerable "ambiguity and uncertainty" surrounding the first amendment rights of cable operators, and, thus, ETI could not have waived its first amendment rights. The district court also relied on the theory that ETI cannot be estopped from asserting its constitutional rights because it lacked knowledge of those rights in 1980, when the franchise agreement was executed. *Id.* at 585–86.

The district court did not, however, reject the City's claim that ETI should be estopped from bringing a *statutory* attack on the franchise agreement's fee provisions. Here, the district court distinguished ETI's constitutional claims from its statutory claims on the ground that, unlike the constitutional claims, ETI's statutory claims involved a known right. It thus held that "by virtue of ETI's acceptance of the franchise fee terms of the 1980 agreement, ETI is estopped from maintaining a statutory attack for alleged violations which occurred under the law both prior to and subsequent to enactment of the Cable Communications Act of 1984." *Id.* at 586.[7]

The district court analyzed the effect of the *Teleprompter* litigation on the instant case, focusing primarily on equitable principles. It concluded that neither the doctrine of equitable estoppel nor the doctrine of judicial estoppel prevented ETI from bringing its present claims against the City. The district court reasoned that judicial estoppel was inappropriate because ETI

"has neither received relief from an adversarial party in a prior litigation nor asserted a position inconsistent with the legal theories which it now posits." *Id.* at 589. Similarly, the district court declined to apply equitable estoppel on the ground that "ETI did not have the opportunity to fully and fairly litigate the instant claims in the *Teleprompter* suit," *id.*, and, thus, the City would be unable to demonstrate detrimental reliance. *Id.* at 590. To the extent that the district court considered the City's sixth affirmative defense,[8] the district court summarily rejected the claim of contractual release without detailed analysis. *See id.* at 589 n. 16; *see also id.* at 590 n. 17 (pertaining to the City's counterclaim).

Having rejected the City's affirmative defenses, except with respect to ETI's statutory claims, the district court next analyzed ETI's constitutional claims. First, the district court reviewed the provision of five percent (5%) franchise fees and found it constitutionally sound. The district court determined at the outset that the City is empowered to exact franchise fees in exchange for the commercial use of the public rights-of-way by ETI. It then concluded that the franchise fees "did not place an inhibition on the content of ETI's speech." *Id.* at 597. It therefore upheld the franchise fees as constitutional.

The district court also analyzed the constitutionality of the fees associated with the access requirements. Applying the Supreme Court's test for assessing the constitutionality of non-content based regulations of speech as set forth in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the district court concluded that the City had the power to regulate cable operators; that the City possessed a substantial interest in ensuring that viewers were afforded their first

---

7. The district court held that ETI "voluntarily relinquished" its rights due to the fact that ETI knew of the three percent (3%) franchise fee limit when it signed the franchise agreement, which called for a five percent (5%) fee until "disapproved by the FCC." 659 F.Supp. at 586–87.

8. This affirmative defense reads as follows:

ETI is barred from making any claim for monetary damages or other relief for actions which occurred on or before January 24, 1984 by virtue of their execution of a "Mutual Release and Covenant" where ETI released the City of Erie inter alia from all claims and damages relating directly or indirectly to the Franchise Ordinance from the beginning of the world through January 24, 1984. ETI's Amended Answer and Counterclaim at 4.

amendment protection; that the City's access fee requirements were unrelated to the suppression of free speech; and that the access fee requirements only incidentally burdened ETI's first amendment rights to an extent no greater than necessary in the furtherance of the City's substantial interests. 659 F.Supp. at 600. The district court thus upheld the fees arising from the access requirements.[9]

The district court was also unpersuaded by ETI's equal protection claims. In response to ETI's contention that the franchising scheme infringed upon a fundamental right and was not imposed on other members of the media, the district court held that "the City's failure to impose cash and in-kind fee requirements on other media forms is attributable to the extensive degree to which ETI's business activity involves the use of the public rights-of-way." *Id.* at 602. The district court also concluded that the access requirements were narrowly tailored and designed to further a compelling governmental interest. On these bases, the court rejected ETI's equal protection claims.

On April 15, 1987, the district court entered its order denying ETI's motion for summary judgment, and granting the City's motion for partial summary judgment with respect to ETI's constitutional claims as well as with respect to the City's breach of contract counterclaim. The district court dismissed all other claims without prejudice and ordered a hearing to determine the damages due the City. On September 3, 1987, the district court's final order awarding the City $360,833 plus prejudgment interest was entered. It was from that order that ETI appealed. We affirm, although we do so on a ground that

differs from the ground upon which the district court relied.[10]

## II.

On appeal, ETI renews the constitutional and federal statutory claims that it raised before the district court. It argues that the franchise and access fees constituted an unconstitutional money- and content-based prior restraint. It also contends that the City's decision to "single out" ETI by requiring it to pay a franchise fee for use of the public rights-of-way violates the first and fourteenth amendments because the City does not impose similar fees on other media organizations or businesses, despite the fact that they also make use of the public rights-of-way. Finally, ETI asserts that the district court erred in holding that ETI's conduct during the 1980 franchising process estops it from asserting claims under the Cable Act of 1984 and FCC regulations.

Although ETI's claims are styled as constitutional in nature, it is evident that the injury to ETI is not an injury to its ability to express itself. ETI does not complain that the City has directly interfered with, prevented, or otherwise hampered its cable services other than by the City's exaction of a greater percentage of ETI's revenues than ETI believes it should pay. Thus, while we recognize first amendment doctrines which proscribe burdens on the media, *see, e.g., Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), we are also equally cognizant of the fact that, in essence, ETI seeks no more here than a money judgment and a monetary adjustment of its contrac-

**9.** Relying on *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) and *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), ETI also challenged the franchise agreement as violative of the first amendment on the theory that the agreement impermissibly "singled out" ETI from other first amendment speakers and from other businesses generally. The district court rejected this argument, reasoning that cable television's "distinct personality" requires "individualized regula-

tion." 659 F.Supp. at 602. It thus held that no first amendment violation could be identified.

**10.** An appellate court may affirm a correct decision by a lower court on grounds different than those used by the lower court in reaching its decision. *See Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 224 (1937); *Securities and Exchange Comm'n v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *PAAC v. Rizzo,* 502 F.2d 306, 308 n. 1 (3d Cir.1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975).

tual obligations under the franchise and access agreements.

### A.

Although ETI did not expressly seek rescission or reformation of the franchise and access agreements, this relief is implicit in ETI's amended complaint and cross-motion for summary judgment. Both pleadings state that the fees mandated by these agreements are excessive and should be readjusted downward so as not to exceed the City's legitimate regulatory costs. *See* App. at 212; Appellant's Cross–Motion For Summary Judgment at ¶ 1(a).

At the outset, we observe that the relief sought by ETI in its complaint and carried forward in its motion for summary judgment raises substantial questions as to whether such relief is available under the facts of this case. In its Supplemental Memorandum,[11] ETI emphasized that it did not seek rescission of the franchise and access agreements, but sought only "refunds or damages for past payments" and declaratory and injunctive relief with respect to prospective payments. Appellant's Supplemental Memorandum at 20–21. ETI did, however, contend that the franchise agreement, by providing for severability of its provisions, contemplated automatic reformation to conform to any judicial determination of illegality. It also contended that reformation was available to incorporate later legal developments into the agreements. We are obliged to address the issue because we must consider whether relief, if granted, can be cast in the form sought by ETI.

### B.

Even if we were so disposed, which we are not, we would be unable to grant ETI the relief it seeks. That relief would require us to compel the City to take steps that are clearly inconsistent with the terms of the franchise and access agreements. It would require us to reform the agreements entered into by and between ETI and the City. We would, for example, be required to replace the five percent (5%) of gross revenues figure provided in Section 29(A) of the franchise agreement, with a three percent (3%) of gross revenues figure. We would also be required to dramatically modify the terms of the access agreement so as to reduce ETI's contractual obligations.

We begin with the premise that "commercial parties are free to contract as they desire." *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001, 1009 (3d Cir.1980); *Brokers Title Co. v. St. Paul Fire and Marine Insurance Co.,* 610 F.2d 1174, 1179 (3d Cir.1979). Once the parties have demonstrated a meeting of the minds and have embodied their agreement in an integrated contract, we are required to give effect to the contract, "[a]bsent illegality, unconscionableness, fraud, duress, or mistake...." *Mellon,* 619 F.2d at 1009; *National Cash Register Co. v. Modern Transfer Co.,* 224 Pa.Super. 138, 142, 302 A.2d 486, 488 (1973). The Pennsylvania courts have consistently held that "[i]t is not the province of the court to alter a contract by construction or to make a new contract for the parties." *Amoco Oil Co. v. Snyder,* 505 Pa. 214, 221, 478 A.2d 795, 798 (1984) (citing *Steuart v. McChesney,* 498 Pa. 45, 49–51, 444 A.2d 659, 661–62 (1982)).[12] Moreover, as we have stated,

11. After oral argument, we requested supplemental briefing with respect to two subjects pertaining to this appeal: (1) the effect of the release as a matter of contract law; and (2) the availability of reformation or rescission in the context of this action. Although the parties' initial briefs adverted to the release, neither brief addressed the issue of appropriate relief. The parties' final supplemental briefs were filed June 30, 1988.

12. The City argues, and we too note, that there is a distinction between a contract that is subject to reformation and an unenforceable contract. Reformation is a type of remedy that is available to a party that seeks to enforce a contract in which a provision has been incorrectly or imperfectly expressed. Illegality, on the other hand, is an affirmative defense, *see* Fed.R.Civ.P. 8(c) and Pa.R.Civ.P. 1030, which may be interposed by a party seeking to avoid its obligations under a contract alleged to be unenforceable. Generally, Pennsylvania courts have held that if an essential term of a contract (such as a price term) is deemed to be illegal, it renders the entire contract to unenforceable by

"the essence of contract law is the objective intent of the parties and when there has been no allegation of mistake, fraud, overreaching or the like, it is not the function of the court to redraft a contract to be more favorable to a given party than the agreement he chose to enter." *Brokers Title Co.*, 610 F.2d at 1181 (citing *Harris v. Dawson*, 479 Pa. 463, 468, 388 A.2d 748, 750 (1980)).

However, under appropriate circumstances, courts may reform or rescind a contract. "[R]eformation and rescission are equitable remedies that are sparingly granted." *H. Prang Trucking Co. v. Local Union No. 469*, 613 F.2d 1235, 1239 (3d Cir.1980). "Reformation presupposes that a valid contract between the parties was created but, for some reason, was not properly reflected in the instrument that memorializes the agreement." *Id.* Reformation requires that a mistake was made and "under Pennsylvania law, a mistake of fact must be mutual in order to open the door to reformation or avoidance of the contract." *Harrison v. Fred S. James, P.A., Inc.*, 558 F.Supp. 438, 443 n. 3 (E.D.Pa.1983); *accord Central Transp., Inc. v. Board of Assessment Appeals*, 490 Pa. 486, 495 n. 5, 417 A.2d 144, 148 n. 5 (1980). Where the party seeking to reform a contract is unable to demonstrate that the principles of contract law have been infringed by a party to the contract, "the law will not reform a written contract so as to make a contract for the parties that they did not make be[t]ween themselves and *certainly never to rescue a party who did not reasonably foresee the consequences of his bargain.*" *Zvonik v. Zvonik*, 291 Pa.Super. 309, 326, 435 A.2d 1236, 1245 (1981) (emphasis in original) (*quoting New Charter Coal Co. v. McKee*, 411 Pa. 307, 312, 191 A.2d 830, 833 (1963)).

ETI argues that reformation is available under either of two theories. First, it claims that the severability provisions contained in Sections 6(F) and 19(B) of the franchise agreement—which essentially provide that the illegality or unconstitutionality of any provision of the agreement would not affect the validity of the remaining provisions of the agreement—allow for severance and reformation of the price terms of the agreements. Second, ETI claims that both parties contemplated that their legal relationship would be conformed to applicable law, even in the absence of the severance and reformation terms of the franchise agreement.

■ The City contends that the agreements cannot be reformed. We agree. Because it is the price terms of the agreements that ETI challenges, reformation is unavailable on either of ETI's theories. While it is true that the franchise agreement provides for severability, the price that ETI contracted to pay for the franchise is clearly an essential, indeed *the* essential, term of its contract. *See, e.g., Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 416, 305 A.2d 689, 692, (1973); *Portnoy v. Brown*, 430 Pa. 401, 406, 243 A.2d 444, 447 (1968); *Zvonik v. Zvonik*, 291 Pa.Super. 309, 323–25, 435 A.2d 1236, 1244 (1981). In fact, the entire bidding process by which ETI outbid its competitors and ultimately obtained the franchise, focused on the percentage of gross revenues that ETI would pay and the manner in which its payment would be made.[13]

Notwithstanding the franchise agreement's severability provisions, reformation cannot be granted where, as here, a party seeks to delete or modify the price and payment terms which are so fundamental to the parties' agreement. Accordingly, if the price and payment terms of the franchise agreement were to be held unenforce-

either party. *See, e.g., Deibler v. Chas. H. Elliott Co.*, 368 Pa. 267, 274–75, 81 A.2d 557, 561 (1951); *Knuth v. Erie–Crawford Dairy Cooperative Ass'n*, 463 F.2d 470, 479 (3d Cir.1972), *cert. denied*, 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973); *see also* Restatement (Second) Contracts § 184(1) (1981). Thus, if we were to hold that the franchise and access agreements are illegal because their price and payment terms

were unconstitutional, ETI's franchise agreement with the City would be unenforceable.

13. The overriding significance of the price and method of payment terms of the franchise agreement is underscored by the fact that ETI felt compelled to raise its prepayment offer from $675,000,000 to $2,700,000 in order to secure the franchise.

able, Pennsylvania law would require that the entire agreement be voided. *See* note 12 and accompanying text, *supra.*

Because we are unable to isolate anything in the record to indicate that the parties have made a mutual mistake which both now acknowledge, and because the price and payment terms, which ETI contests here, are the most essential terms of the agreement, reformation cannot be granted even if ETI were to succeed in its constitutional claims. Given that reformation would not be available even if ETI prevailed on its constitutional claims, we turn to a consideration of rescission as an alternative form of relief.

### C.

Rescission "amounts to the unmaking of a contract, and is not merely a termination of the rights and obligations of the parties towards each other, but is an abrogation of all rights and responsibilities of the parties towards each other from the inception of the contract. It is a form of retroactive relief." *Metropolitan Property & Liability Insurance Co. v. Commonwealth,* 97 Pa.Commw. 219, 509 A.2d 1346, 1348 (1986), aff'd, 517 Pa. 218, 535 A.2d 588 (1987); *Gilmore v. Northeast Dodge Co., Inc.,* 278 Pa.Super. 209, 216, 420 A.2d 504, 507 (1980). In addition, while rescission may be inferred from the parties' action and thus need not be expressed in words, "there must be mutual agreement of the parties to rescind." *Johnston v. Johnston,* 346 Pa.Super. 427, 432, 499 A.2d 1074, 1077 (1985).

Rescission of a contract is tantamount to relieving the parties of all obligations under the contract and returning to the *status quo ante* as it existed prior to the execution of the contract. Thus, rescission must occur in toto. *Sherman v. Medicine Shoppe Int'l., Inc.,* 581 F.Supp. 445, 450 (E.D.Pa.1984). Similarly, voiding a contract as inconsistent with public policy requires complete invalidation of the contract. *Shadis v. Beal,* 685 F.2d 824, 828 n. 7 (3d Cir.1982) (*citing In Book's Estate,*

297 Pa. 543, 147 A. 608, 609 (1929)). *Rothberg v. Rosenbloom,* 628 F.Supp. 746, 755 (E.D.Pa.1986) (*citing Fitzsimons v. Eagle Brewing Co.,* 107 F.2d 712, 713 (3d Cir. 1939)); *Contractor Industries v. Zerr,* 241 Pa.Super. 92, 97, 359 A.2d 803, 805 (1976); J. Calamaria J. Perillo, The Law of Contracts ch. 22 (3d ed. 1987); Restatement (Second) of Contracts § 178 *et seq.* (1979). We need not dwell on this form of relief, however, because ETI has, despite the import of the relief sought in its complaint, unequivocally rejected any relief that would require rescinding or voiding the agreements.[14] *See* Appellant's Supplemental Memorandum at 20.

However, before we arrive at the ultimate relief to which ETI may be entitled, it would appear prudent to determine the validity of ETI's claims. If, as we have intimated, the release which ETI executed in concluding the *Teleprompter* litigation bars ETI's claims, it will be unnecessary to reach the issue of what relief may be granted.

### III.

Because this matter arises on summary judgment, ETI and the City having moved and cross-moved, and the district court having granted summary judgment for the City, we are obliged to examine the summary judgment motion and supporting documents as they pertain to the release issue. We do so for two reasons.

First and foremost, the release, having been pleaded as an affirmative defense by the City, is obviously a nonconstitutional ground for resolving this case. As such, we should, if possible, focus on such a ground for disposition of this proceeding. We have been instructed as a matter of established federal jurisprudence, that a court faced with both constitutional and nonconstitutional claims must address the nonconstitutional claims first, if doing so will enable the court to avoid a constitutional confrontation. *See Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2998, 86

---

**14.** We recognize that ETI's substantial investment as the exclusive cable operator in the City would render ETI unwilling to expose itself to the risk of losing its franchise.

L.Ed.2d 664 (1985); *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 2199, 68 L.Ed.2d 693 (1981); *Hagans v. Lavine,* 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974); *Ashwander v. TVA,* 297 U.S. 288, 346–49, 56 S.Ct. 466, 482–84, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *United States v. Clemons,* 843 F.2d 741, 749–50 (3d Cir.1988). As Justice Brandeis stated over half a century ago, "[a court must] not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.... Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, ... [a court] will decide only the latter." *Ashwander,* 297 U.S. at 347, 56 S.Ct. at 483 (Brandeis, J., concurring).

Second, it is also clear that if effect is to be given to ETI's release of the City, the release would dispose of every claim at issue in this proceeding. Thus, because of the Supreme Court's jurisprudential mandate that we address nonconstitutional claims before considering constitutional claims, and because prudential considerations dictate that we resolve all cases on as narrow a ground as possible, we turn to a consideration of the release prior to addressing the other issues raised on appeal.

Our standard of review in a summary judgment context is plenary. Thus, we apply "the same test the district court should have utilized initially." *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In reviewing a grant of summary judgment, we must be convinced that the prevailing party has successfully demonstrated "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Moreover, all inferences must be drawn against the movant, in this case the City, and in favor of the nonmovant, in this case ETI. *See Goodman,* 534 F.2d at 573.

With this standard in mind, we must determine whether the district court properly entered summary judgment in favor of the City and against ETI. As previously noted, we may affirm a district court's judgment on grounds not relied upon by the district court. *See* note 10, *supra.*

Focusing our attention on the release entered into by ETI and the City in 1984, we are unable to identify any disputed material facts that would render summary judgment unavailable. It is true that ETI has called our attention to two affidavits, whose purport is that ETI did not intend to waive any federal, state or constitutional claims when it entered into the *Teleprompter* release in 1984, thus ostensibly raising a material factual dispute. *See* App. at 560–63.[15] However, such extra-contractual evidence is insufficient to contradict the plain language of an integrated contract under Pennsylvania law. *See* Typescript page 39, *infra.* Accordingly, evidence of that nature will not suffice to raise a factual conflict precluding entry of summary judgment. Thus, we are satisfied that the district court was correct in

---

**15.** The affidavits of Daniel J. Danser, Assistant Secretary of ETI in 1984, and Henry J. Gerken, Vice–President and Secretary of ETI in 1984, are identical in substance. They both state, in pertinent part:

> In signing the Mutual Release and Covenants, I *did not* believe that ETI was releasing, nor did I intend to release, the City from its past, present, and future obligation under the November 11, 1980 Franchise Agreement and the December 3, 1980 Franchise Ordinance to comply with all applicable federal and state law in the City's dealings with ETI. Addition-

ally, I did not believe that ETI was releasing, nor did I intend to release, the City from its direct past, present, and future obligations to comply with all applicable federal and state law in the City's dealings with ETI. Certainly, in signing that Mutual Release and Covenant, I had no intention of releasing, waiving, or abandoning, retrospectively or prospectively, ETI's rights under the United States and Pennsylvania Constitutions and the Communications Act of 1934, as amended.

App. at 563.

finding no material dispute of fact.[16]

### IV.

As we have briefly discussed above, ETI and the City were codefendants in a suit brought by Teleprompter, ETI's chief cable competitor, in which Teleprompter sought to invalidate the franchise agreement entered into by ETI and the City. The release, urged by the City as a defense to the present action, resulted from a settlement of that litigation, which occurred on January 24, 1984. In the release, which provides the basis for our analysis, ETI, and its parent company American Television and Communications Corporation, agreed to:

> release, remise, quitclaim, and forever discharge the City of Erie, [Teleprompter] and [Westinghouse] from *any and all claims*, demands, actions or *causes of action*, damages, judgments, and execution, *of whatsoever nature*, in any way *relating to*, directly or indirectly, *the Franchise* together with any and all litigation arising from, or in connection with, *said Agreement* including, but *not limited to*, the pending action from the beginning of the world to the date of these presents.

App. at 819 (emphasis added).

### A.

As argued by ETI in its supplemental memorandum, in order to determine whether EIT's execution of the release constitutes a contractual waiver of its right to challenge the validity of the franchise agreement as violative of the first and fourteenth amendments, we do not apply Pennsylvania contract principles as we normally would in analyzing a release,[17] *see,*

*e.g., Three River Motors Co v. Ford Motor Co.,* 522 F.2d 885, 892–96 (3d Cir.1975), because "the question of a waiver of a federally guaranteed constitutional right is . . . a federal question controlled by federal law." *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 1247, 16 L.Ed.2d 314 (1966); *Sambo's Restaurants, Inc. v. Ann Arbor,* 663 F.2d 686, 690 (6th Cir.1981); *Commonwealth v. Waring,* 366 Pa.Super. 144, 145–46, 530 A.2d 933, 934 (1987) (*quoting Commonwealth v. Norman,* 447 Pa. 217, 221–22, 285 A.2d 523, 526 (1971)).

Although the Supreme Court has recognized that constitutional rights may be waived under particular circumstances, *see, e.g., Patterson v. Illinois,* — U.S. —, —, 108 S.Ct. 2389, 2395–96, 101 L.Ed.2d 261 (1988) (right to counsel); *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (right to counsel); *D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 184–86, 92 S.Ct. 775, 782–83, 31 L.Ed.2d 124 (1972) (due process rights); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967) (first amendment rights), it is well settled that such waivers must be voluntary, knowing, and intelligent, *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541; *Edwards v. Arizona,* 451 U.S. 477, 483–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Fuentes v. Shevin,* 407 U.S. 67, 95, 92 S.Ct. 1983, 2002, 32 L.Ed.2d 556 (1972); *D.H. Overmyer Co.,* 405 U.S. at 185, 92 S.Ct. at 782; *Johnson v. Zerbst,* 304 U.S. 458, 468–69, 58 S.Ct. 1019, 1025, 82 L.Ed. 1461 (1938), and must be established by "clear" and "compelling" evidence. *See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967); *Rodgers v. United States Steel Corp.,* 536 F.2d 1001, 1007 & n. 14 (3d Cir.1976).

---

**16.** In the district court, the City evidently emphasized its equitable estoppel defenses rather than focusing primarily on the contractual effect of the release. On appeal, however, the City argues that ETI is barred from bringing this action not only by the doctrines of judicial estoppel and res judicata, but by the doctrine of release as well. *See* Appellee's Brief at 17. The district court remitted its discussion of the contractual effect of the release to a footnote, *see* 659 F.Supp. at 589 n. 16, and concentrated its

analysis, instead, on the equitable estoppel defenses.

**17.** We will analyze the release as a contract, given that in Pennsylvania courts, "[w]ritten releases are construed according to the rules governing the construction of contracts generally." *In Re: Estate of Kirk,* 369 Pa.Super. 515, 516–17, 535 A.2d 669, 670 (1988); *Sparler v. Fireman's Ins. Co.,* 360 Pa.Super. 597, 601, 521 A.2d 433, 434 (1987).

The Supreme Court has noted that "waiver is ordinarily an intentional relinquishment of a known right or privilege," *Johnson*, 304 U.S. at 464, 58 S.Ct. at 1023, and has instructed courts to " 'indulge in every reasonable presumption against waiver' of fundamental constitutional rights and ... '[not to] presume acquiescence in the loss' " of such rights. *Id.* (*quoting Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393, 57 S.Ct. 809, 811, 81 L.Ed. 1177 (1931)); *Glasser v. United States*, 315 U.S. 60, 70–71, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942). While the Supreme Court has never defined precisely what constitutes a "voluntary, knowing, and intelligent" waiver, the Court has stated that whether a constitutional right has been waived "depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience and conduct' " of the waiving party. *Edwards*, 451 U.S. at 482, 101 S.Ct. at 1883 (*quoting Johnson*, 304 U.S. at 464, 58 S.Ct. at 1023) (criminal context).

Supreme Court jurisprudence on the contractual waiver of a constitutional right, such as appears in the present case, is discussed in two Supreme Court cases. *See D.H. Overmyer v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 134 (1972) and *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

In *D.H. Overmyer*, the Court outlined the factors to be considered in determining whether a constitutional right has been waived. Overmyer, a warehousing corporation, executed a contract with Frick for the manufacture and installation of a refrigeration system. The contract, into which Overmyer had freely entered, required Overmyer to give a cognovit note [18] in which it waived notice and a hearing prior to entry of a judgment in the event that Overmyer defaulted on its payments. After Overmyer failed to make timely progress payments, Frick caused judgment to be entered against Overmyer without prior notice to Overmyer.

Applying the same standards as it had applied in the criminal context, *See, e.g., Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970); *Johnson*, 304 U.S. at 464, 58 S.Ct. at 1023, the *D.H. Overmyer* Court held that procedural due process rights could, under the right circumstances, be waived and that Overmyer had indeed waived its rights. After reviewing waiver jurisprudence in the criminal context—waiver of the right to counsel, the right against self-incrimination, and the right to be present at trial—the Supreme Court determined that Overmyer's waiver met the criminal standard but did not determine whether a lower standard might obtain in a civil context.

In reaching its conclusion, the Court emphasized, among other things, that Overmyer was a corporation with widespread activities and a complicated corporate structure; that Overmyer and Frick had equal bargaining power; and that Overmyer did not contend that it or its counsel was unaware of the significance of the note and of the cognovit provision. *Id.* 405 U.S. at 186, 92 S.Ct. at 783. On the basis of these facts, the Supreme Court concluded that Overmyer had "voluntarily, intelligently, and knowingly waived the rights it otherwise possessed to prejudgment notice and hearing, and that it did so with full awareness of the legal consequences." *Id.* at 187, 92 S.Ct. at 783. In his concurrence, Justice Douglas stressed the process leading up to the execution of the disputed contract, stating that:

> [W]hatever procedural hardship the Ohio confession of judgment scheme worked upon the petitioners was voluntarily and understandingly self-inflicted through the arms-length bargaining of these corporate parties.

*Id.* at 189, 92 S.Ct. at 784 (Douglas, J., concurring).

Although the facts presented in *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) were highly dissimilar

---

**18.** The *D.H. Overmyer* Court defined a cognovit note as an "ancient legal device by which the debtor consents in advance to the holder's obtaining a judgment without notice or hearing, and possibly even with the appearance, on the debtor's behalf, of an attorney designated by the holder." *D.H. Overmyer*, 405 U.S. at 176, 92 S.Ct. at 777.

from the facts of *D.H. Overmyer* and thus led to a different disposition, the Supreme Court's analysis in *Fuentes* reaffirmed the analysis set forth in *D.H. Overmyer*. In *Fuentes*, Margarita Fuentes had purchased household goods from Firestone Tire and Rubber Company under a conditional sales contract and consistently made her installment payments until a dispute arose between Fuentes and Firestone over servicing those household goods. Under the terms of the contract, Fuentes was entitled to possession of her purchases unless she defaulted on her installment payments. When Fuentes refused to make her payments because of the dispute, Firestone caused a writ of replevin to issue and a sheriff seized the disputed goods. Fuentes subsequently challenged the constitutionality of the prejudgment replevin provisions of Florida law, arguing that they constituted a due process violation. Firestone argued that Fuentes had contractually waived her right to notice and a hearing and was bound by the contractual waiver.

In holding that Fuentes had not waived her due process rights, the Supreme Court applied its holding in *D.H. Overmyer*, stating that:

> The contract in *Overmyer* was negotiated between two corporations; the waiver provision was specifically bargained for and drafted by their lawyers in the process of these negotiations. As the Court noted, it was "not a case of unequal bargaining power or overreaching. The Overmyer–Frick agreement, from the start, was not a contract of adhesion." *Id.* at 186 [92 S.Ct. at 783]. Both parties were "aware of the significance" of the waiver provision. *Ibid.*

> The facts of the present cases are a far cry from those of *Overmyer*. There was no bargaining over contractual terms between the parties who, in any event, were far from equal in bargaining power. The purported waiver provision was a printed part of a form sales contract and a necessary condition of the sale. The appellees made no showing whatever

that the appellants were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights.

*Fuentes*, 407 U.S. at 95, 92 S.Ct. at 2002.

■ Taken together, *D.H. Overmyer* and *Fuentes* stand for the proposition that constitutional rights, like rights and privileges of lesser importance, may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver. Such volition and understanding are deemed to be, and indeed have been held to be, present, where the parties to the contract have bargaining equality and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and has engaged in other contract negotiations.

### B.

■ Because our Court has not, to date, analyzed a contractual waiver of constitutional rights, we are required to apply *D.H. Overmyer* and *Fuentes* to a contractual waiver for the first time.[19] In our view, the facts of the present case are sufficient to establish that the waivers provided in the *Teleprompter* release meet the requirements for a valid contractual waiver.

The district court found that at the time the settlement was reached, and the release was executed, the only issue remaining in the *Teleprompter* litigation was "whether the City had afforded *Teleprompter* adequate due process rights during the franchise bidding process." 659 F.Supp. at 589. The district court's opinion continued by stating that "[t]he legality of the franchise fees or access support payments was never made an issue in the prior litigation. Accordingly, because the issue was not contemplated by either ETI or the city for inclusion in the mutual release, the writing may not be construed as a waiver of the present claims." *Id.*

We cannot agree with the district court's analysis because we are not persuaded that

---

**19.** In *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885 (3d Cir.1975), we analyzed a contractual waiver of statutory (antitrust) rights construing a release, under Pennsylvania law.

the issues raised in the prior litigation have any bearing on the *contractual* effect of the release. The language of the release is clear and unambigous and was obviously meant to put an end to all disputes (such as those raised in the *Teleprompter* litigation) arising out of the franchise agreement, including those of constitutional dimension.[20] It is evident that the parties here were counseled prior to entering into the release and that the release has nothing in common with a contract of adhesion such as the one at issue in *Fuentes.* In addition, ETI's parent company, ATC, as the second largest cable operator in the nation, was obviously familiar with litigation, settlements and releases of the type executed by it in this case.

Furthermore, we are compelled to note that the settlement of the *Teleprompter* litigation—and the execution of the associated Mutual Consent and Covenants—afforded ETI a substantial benefit, the effect of which cannot be overstated. The district court characterized the benefit received by ETI as follows:

> There can be no dispute that ETI has benefitted from the award of the cable franchise. ETI was given the first opportunity to wire the City of Erie for cable television reception. In an industry where the award of a franchise oftentimes creates a natural monopoly in a local market, *see Omega Satellite Products v. City of Indianapolis,* 694 F.2d 119, 127–28 (7th Cir.1982); *Berkshire Cablevision of Rhode Island v. Burke,* 571 F.Supp. 976, 985 (D.R.I.1983) *vacated as moot* 773 F.2d 382 (1st Cir.1985), a franchise recipient, in the very least, receives a competitive advantage over would-be entrants into the market.
>
> The City's grant of the franchise has insulated ETI from competition and, inevitably, acted to exclude other cable operators from being able to 'speak.'

659 F.Supp. at 595 n. 23.

By entering into the settlement which required all parties to discontinue any challenge to the franchise agreement, ETI was able to terminate conclusively any competition that it faced from other cable companies with respect to its monopoly and profits during the ten year duration of the franchise and access agreements. *See Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d 119, 127–28 (7th Cir.1982); *Berkshire Cablevision of Rhode Island, Inc. v. Burke,* 571 F.Supp. 976, 985 (D.R.I.1983), *vacated as moot,* 773 F.2d 382 (1st Cir.1985). Having become the sole cable operator in the City as the result of a protracted and complex bidding process, ETI may not now seek to withdraw from performing its obligations and from discharging its burdens, while it still continues to retain all of the benefits it received from the City as a result of the agreements.

### C.

Although ETI contends that the release does not apply to the claims it is asserting in the present suit, we are not persuaded by the logic of its arguments. Referring to paragraph 6 of the release in which ETI and its parent company expressly release the City from "any and all claims ... causes of action, [and] damages ... of whatsoever nature," App. at 819, ETI asserts that the release does not allude to "known or unknown" claims and thus cannot be construed as releasing the City from such claims.

ETI relies on this court's decision in *Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885 (3d Cir.1975) in which the court read the release phrase "[claims] ever had, now have or ... hereinafter can, shall or may have" as the functional equivalent of "known or unknown [claims]," 522 F.2d at 895, for purposes of defining the intended scope of a release. On the basis of this language from *Three Rivers,* ETI argues that the release in the instant case,

---

**20.** As we noted in *Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d at 892–93, under Pennsylvania law, "where the parties manifest an intent to settle all accounts, the release will be given full effect even as to unknown claims." Although *Three Rivers* arose in an antitrust, and thus a statutory, context, we believe its reasoning is persuasive in the present case.

which includes neither the phrase "known or unknown," nor the *Three Rivers* phrase "ever had ... shall or may have," was therefore intended to refer only to "known" and not "unknown" claims. The language in the instant release persuades us otherwise.

Here, ETI expressly released the City from:

> *any and all claims*, demands, actions or causes of action, damages, judgments and execution, *of whatsoever nature, in any way relating to, directly or indirectly, the Franchise together with* any and all litigation arising from, *or in connection with* said Agreement *including* but not limited to, *the pending action from the beginning of the world to the date of these presents*.

App. at 819 (emphasis added). While this language concededly is not identical to the language of the release in *Three Rivers*, it is clearly equally broad in scope and, by its own terms, was obviously meant to preclude ETI from asserting "any and all claims ... causes of action, [and] damages ... of whatsoever nature ... relating to, directly or indirectly ... the franchise ... together with any and all litigation ... in connection with said agreement." We are satisfied that the unlimited reach of the release terms, sweeps within its compass every cause of action asserted by ETI in its complaint.

### 1.

Moreover, ETI's assertion that the release does not encompass ETI's constitutional claims presupposes that, at the time it entered into the release in January 1984, it was not aware of its constitutional claims and thus could not have waived its right to assert those claims. *See* Appellant's Supplemental Memorandum at 17; Statements of David J. Saylor at Oral Argument on April 11, 1988. However, our review of the case law and writings discussing the first amendment rights of cable television operators and published prior to the date of ETI's release in 1984, has convinced us otherwise.

Prior to ETI's execution of the *Teleprompter* release, a number of federal courts and commentators had recognized and specifically discussed the first amendment rights of cable television operators. *See, e.g.,* G. Shapiro, P. Kurland, & J. Mercurio, *"Cablespeech": The Case For First Amendment Protection* (1983); Note, *Cable Television and Content Regulation: The FCC, The First Amendment and The Electronic Newspaper*, 51 N.Y.U. L.Rev. 133, 144 & n. 65 (1976); Note, *Midwest Cable Corp. v. FCC; The First Amendment Implications of Cable Television Access*, 54 Ind.L.J. 109, 116–23 (1978); *Home Box Office Inc. v. F.C.C.*, 567 F.2d 9, 44–45 (D.C. Cir.) (per curiam), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *Midwest Video Corp. v. F.C.C.*, 571 F.2d 1025, 1052–57 (8th Cir.1978), *aff'd on other grounds*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979); *Black Hills Video Corp. v. F.C.C.*, 399 F.2d 65, 69 (8th Cir. 1968); *Weaver v. Jordan*, 64 Cal.2d 235, 49 Cal.Rptr. 537, 542, 411 P.2d 289, 294 *cert. denied*, 385 U.S. 844, 87 S.Ct. 49, 17 L.Ed. 2d 75 (1966); *Berkshire Cablevision of Rhode Island v. Burke*, 571 F.Supp. 976 (D.R.I.1983), *vacated as moot*, 773 F.2d 382 (1st Cir.1985); *cf. Buckeye Cablevision, Inc. v. F.C.C.*, 387 F.2d 220, 225 (D.C. Cir. 1967). Moreover, many of the non-cable television cases relied upon by ETI in making its first amendment arguments in the present case were decided well before ETI signed the *Teleprompter* release and, for that reason, provided first amendment jurisprudence which undercut ETI's contention that it was unaware of the constitutional arguments which it now presses. *See, e.g., Bolger v. Youngs Drug Products. Corp.*, 463 U.S. 60, 65, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983) (content-based restrictions struck down under all but the most extraordinary circumstances); *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (municipally-imposed licensing fee requirement for door-to-door solicitation struck down as violative of first amendment); *Buckley v. Valeo*, 424 U.S. 1, 48–49, 96 S.Ct. 612, 648, 46 L.Ed.2d 659 (1976) ("the concept that government may restrict the speech of

some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment."). Indeed, these very cases are the cases upon which ETI has placed primary reliance in urging us to hold that the franchise agreement which ETI executed, violated ETI's constitutional rights. *See* Appellant's Brief *passim.*

Thus, while it is safe to conclude that the first amendment jurisprudence as to the rights of cable television operators may still be in its infancy, we are not convinced by ETI's claim that it was ignorant of those rights in 1984 when it executed the release, the effect of which it now seeks to circumvent. On the basis of the case law and commentary then available, ETI must have known in January 1984, when it executed the *Teleprompter* release, that the constitutional claims it now asserts, were available to be asserted at that time.

### 2.

ETI also asserts that if we were to give full effect to the release as we have interpreted its scope, the release would be inconsistent with Section 18(I) of the franchise agreement. That section preserves ETI's "rights of judicial review of any action by the City under or arising out of this Franchise Agreement ..." App. at 351. The flaw in ETI's Section 18(I) argument is that it does not take into account the interval between the execution of the franchise agreement in 1980 and the execution of the release in 1984. While it is true that Section 18(I) evinced an intent by the parties *in 1980* to allow ETI to seek judicial review of certain of the City's actions, it is also true that the release executed in January 1984 evinced an intent by the parties *in 1984* to put an end to all litigation arising out of the franchise agreement. Viewed in this light, the release constituted at the very least, a subsequent modification of Section 18(F). We would be remiss if we did not give this modification the full force and effect it was clearly intended to have.

### D.

Nor are we persuaded by ETI's argument that public policy would prevent ETI from releasing its constitutional claims within the context of the present proceeding. First, we know of no doctrine, and ETI has directed us to no case law, providing a *per se* rule that constitutional claims, even first amendment claims, may not be waived. *Cf. Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987). Indeed, ETI acknowledges as much when it concedes, as it must, that first amendment claims may be waived upon clear and convincing evidence that the waiver is knowing, voluntary and intelligent. *See* Appellant's Supplemental Memorandum at 4–5, 16–18.

We agree that public policy must be considered as a factor in determining whether to give effect to a waiver of constitutional rights. However, we are of the opinion that the "knowing, voluntary and intelligent" standard established by the Supreme Court for the waiver of constitutional rights, subsumes consideration of the public's interests. *Johnson v. Zerbst,* 304 U.S. 458, 462–69, 58 S.Ct. 1019, 1022–25, 82 L.Ed. 1461 (1938). In its Supplemental Memorandum at 5, ETI claims that the Supreme Court's recent decision in *Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 proscribes the enforcement of a release of federal rights where enforcement would contravene public policy. While we agree generally with this broad proposition, we are nevertheless convinced that *Town of Newton* is inapposite with regard to the instant case.

In *Town of Newton,* a criminal defendant, in exchange for the prosecutor's dismissal of the charges against him, agreed to release any § 1983 claims he had against the town of Newton resulting from his arrest. That case, while it indicated that public policy should be taken into account in determining whether to enforce a written release of constitutional rights, held that a *per se* rule against enforcement of release-dismissal agreements was *not* required. Moreover, as this brief description makes clear, *Town of Newton* was a criminal case that arose in a factual context that is completely distinguishable from the facts

of the present case. Thus, in our opinion, *Town of Newton* has no relevance to our analysis in the instant case. In addition, we are of the view that the factual distinctions between the present case and *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), also cited to us by ETI and which involved an employee's waiver of statutory rights under the Fair Labor Standards Act, make that case similarly inapplicable.

### E.

ETI's next assertion, and one that it seeks to support by reference to two affidavits executed in October of 1986, (two years after ETI executed the release and over one year after the present litigation had commenced), is that in signing the release, it did not intend to release the City from complying with federal, state, or constitutional law. *See* App. at 560–63. ETI also argues that "in ascertaining the intent, scope and enforceability of a release, the court must consider the circumstances surrounding the release's execution." Appellant's Supplemental Memorandum at 8.

However, in any matter of contract interpretation, the language of the agreement itself provides us with the primary, as well as the initial, touchstone in formulating our interpretation. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir.1980); *Brokers Title Co.*, 610 F.2d at 1181; *Kane Gas Light & Heating Co. v. Pennzoil Co.*, 587 F.Supp. 910, 911 (W.D.Pa.1984). Here, we are satisfied that the language of the release is clear and unambiguous and that it represents the parties' intent to put an end to all litigation arising from, or in connection with, the franchise agreement. Moreover, under Pennsylvania law, which would obviously govern in giving contractual content to the release in this case, "[w]hen two contracting parties embody their agreement in a written document, intending the written document to be the sole, complete, and final repository of the terms of their agreement, the contract is said to be completely integrated. Under those circumstances, averments of additional terms [i.e., the two affidavits] which would modify or contradict the written terms will not be given effect." *National Building Leasing, Inc. v. Byler*, 252 Pa.Super. 370, 381 A.2d 963 (1977).[21]

As we have earlier discussed, the particular terms of the release, by which ETI released all claims pertaining to the franchise, failed to provide any exclusions from its operation. We are satisfied that the clear and unambiguous language of the release refutes any argument that the circumstances surrounding its execution should restrict its scope in any way. Thus, we are confident that, under these guiding principles, neither the affidavits submitted by ETI, nor any of the circumstances identified by ETI, are sufficient to modify the terms of the release as drawn.

### F.

Finally, ETI asserts that the absence of consideration flowing from the City to ETI in the release demonstrates that ETI did not intend to forfeit its constitutional rights with respect to the franchise. We reject this argument. First, the paragraph of the release in which ETI releases the City, contains an explicit recitation of consideration and acknowledgment of the consideration's sufficiency. *See* App. at 819. Second, the release was executed under seal. *Id.* at 821–22. Under Pennsylvania law and in circumstances such as those present here, where a want of consideration is alleged, a seal automatically imports consideration for the release. *See, e.g., Selden v. Jackson*, 425 Pa. 618, 619, 230 A.2d 197, 197–98 (1967); *Young v. Pileggi*, 309 Pa.Super. 565, 572, 455 A.2d 1228, 1232

---

**21.** The Pennsylvania cases cited by ETI for the proposition that the court must examine all relevant facts and circumstances surrounding the execution of the release, and not simply the language of the release, *see, e.g., Buttermore v. Aliquippa Hosp.*, 368 Pa.Super. 49, 58–59, 533 A.2d 481, 486 (1987); *see Sparler v. Fireman's Insurance Co. of Newark, New Jersey*, 360 Pa.Super. 597, 601–02, 521 A.2d 433, 435 (1987) (en banc), *app. denied* —— Pa. ——, 540 A.2d 535 (1988), have no application to this case. In those cases, the factual circumstances involving insurance payments, were completely distinguishable from the circumstances here.

(1983); *cf. Newman v. Sablosky*, 268 Pa. Super. 85, 90, 407 A.2d 448, 451 (1979); *Federal Deposit Ins. Corp. v. Barness*, 484 F.Supp. 1134, 1149 (E.D.Pa.1980). Third, agreements such as this release, which are incorporated into a Consent Order entered by the district court, are enforceable with or without consideration. *See* Restatement (Second) of Contracts § 94 (1981) ("A promise or agreement with reference to a pending judicial proceeding, made by a party to the proceeding ... is binding without consideration."). Lastly, the City observes that ETI was in effect the third party beneficiary of the settlement agreement whereby the City was obliged to make substantial payments over time to Teleprompter in exchange for Teleprompter's termination of its suit against the City and ETI, among others. *See* Appellee's Supplemental Reply Brief at 6–7. For these reasons, ETI's suggestion that the release lacked adequate consideration, is meritless.

### G.

Having held that ETI, by the express terms of its January 1984 release, surrendered all claims, causes of action, and the like which it then had, ETI cannot argue that the City was constitutionally precluded from charging a five percent (5%) instead of a three percent (3%) franchise fee. ETI's cause of action against the City to recoup and to adjust allegedly excessive franchise fees necessarily arose in 1980, when the franchise agreement imposing those fees was executed. Thus, in 1984, when ETI released the City from any cause of action which it had against the City in relation to the franchise agreement, it effectively extinguished its right not only to recoup fees that it had paid prior to the signing of the release, but also its right to challenge fees from 1984 forward. *See, e.g., Northern Oil Co. v. Standard Oil Co.*, 761 F.2d 699, 707 (Temp.Emer.Ct.App. (1985); *United States v. Allegheny–Ludlum Ind., Inc.*, 517 F.2d 826, 853–54 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

In sum, *D.H. Overmyer* and *Fuentes*, when applied here, lead us to the conclusion that ETI, by executing a broad and general release in January 1984, knowingly, voluntarily, and intelligently relinquished any constitutional causes of action which it must have known could be asserted against the City. We are satisfied that the release voluntarily executed by ETI in 1984 does no more than require ETI to live up to its agreement. Thus, the contractual waiver in this case was made by equally competent parties to a commercial transaction, pursuant to the advice of counsel, and following a valid bargaining process that led to entry of a consent decree by a federal district court judge. In addition, because our analysis of the release cuts across the other claims raised by ETI on appeal, (except for the time value claim discussed in Part V, *infra*), we have no need to address those claims in disposing of this appeal.[22]

### V.

In its amended complaint, *see* App. at 208, 223–25, ETI claims that it was, and

---

**22.** In light of our discussion which rests wholly on the nonconstitutional issue of release, we have no occasion to address the sufficiency of the record with respect to the constitutional issues framed by ETI. Suffice it to say that, if constitutional issues such as the ones presented here are to be resolved, it becomes incumbent upon the plaintiff to meet its burden of explicating in full the background and nature of the particular technology, in this case cable television, to which the constitutional claims are pertinent. This is particularly so in a summary judgment context, where the record in these particulars may not be as completely fleshed out as it might otherwise be at trial. As Justice Blackmun has recently written:

> Different communications media are treated differently for First Amendment purposes.

[citations omitted]. In assessing First Amendment claims concerning cable access, the Court must determine whether the characteristics of cable television make it sufficiently analogous to another medium to warrant application of an already existing standard or whether those characteristics require new analysis. As this case arises out of a motion to dismiss, we lack factual information about the nature of cable television.

*City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 496, 106 S.Ct. 2034, 2038, 90 L.Ed.2d 480 (1986) (Blackmun, J., concurring). Although the present case arises in a summary judgment context, the same reasoning is applicable.

continues to be, entitled to the time value of its $2,700,000 prepayment, (i.e., the interest that would accrue on that amount over the life of the franchise), since it was paid in 1980. ETI bases this argument on § 542(b) of the Cable Communications Policy Act, 47 U.S.C. § 521 *et seq.* (Supp. II 1984) which provides for a five percent (5%) cap on franchise fees, including the time value of money. The district court denied ETI's claim essentially on the ground that ETI had not bargained for the time value of its prepayment. In rejecting ETI's argument that it should not be required to pay pre-judgment interest on the judgment awarded to the City because the City had already had the benefit of that interest on the $2,700,000 prepayment, the district court stated that "[i]t is more than clear that ETI's "circumstance" is as one who has wilfully breached a contract which was not as advantageous as it had originally thought." App. at 24.

On our review of the record, we have come to the same conclusion as did the district court with respect to the years preceding the 1984 enactment of the Cable Act. However, the district court did not discuss one aspect of ETI's claim that leads us to a different conclusion as to ETI's entitlement to interest on its prepayment for the years *following* the enactment of the Cable Act. ETI calls our attention to 42 U.S.C. § 542(b), which provides that:

> For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system. For purposes of this section, the 12–month period shall be the 12–month period applicable under the franchise for accounting purposes. Nothing in this subsection shall prohibit a franchising authority and a cable operator from agreeing that franchise fees which lawfully could be collected for any such 12–month period shall be paid on a prepaid or deferred basis; *except that the sum of the fees paid during the term of the franchise may not exceed the amount, including the time value of money, which would have lawfully been collected if such fees had been paid per annum.*

*Id.* (emphasis added).

Because the Cable Act became effective on December 29, 1984, it is obvious that neither ETI nor the City could have been aware of its provisions in 1980 when the franchise agreement was executed. It is evident that the statute proscribes charges in excess of five percent (5%) of gross revenues during any twelve month period. It is also clear that the five percent (5%) cap includes a calculation of the time value of monies that have been prepaid. However, as indicated by the underscored portion of § 542(b) cited above, the calculation as to whether the sum of the fees paid during the entire term of the franchise agreement—including a determination of whether the inclusion of a time value calculation would increase the fees paid to an amount exceeding the five percent (5%) ceiling—cannot be made until the expiration of the franchise term, which, in the present case, will not occur until 1990.

Moreover, it is clear from the legislative history of the Cable Act that Congress intended the Act to apply not only to franchise agreements entered into *after* its enactment but to franchise agreements that had been entered into *prior* to the Act's passage. The Conference Report for the Cable Act contains the following passage:

> Any franchise in effect on the effect [sic] date of [the Cable Act] that provides for a franchise fee in an amount up to or in excess of the five percent limitation in section 622(b) (with or without the need for action by any Federal agency) shall be deemed to have lawfully required such fee, *up to but not in excess of five percent,* as of such effect date, except that where a franchise explicity [sic] establishes a later date or any condition for the imposition of such fee, such later date or condition shall apply.

130 Cong.Rec. S14285 (daily ed. Oct. 11, 1984) (emphasis added). In our view, the underscored language makes clear that the Act was meant to limit even those franchise agreements that predated the pas-

sage of the Act to a maximum franchise fee of five percent (5%) per year.

Under the instant franchise agreement, ETI was not required to pay an annual amount in excess of $100,000, even if that amount was less than five percent (5%) of ETI's gross revenues, until such time as ETI had "recovered" its prepaid franchise fees of $2,700,000. The record indicates that this "recovery" has not yet taken place and we are unable to determine—and under the terms of the Cable Act will not be required to determine until the expiration of the term of the franchise—whether the five percent (5%) maximum authorized by the Cable Act, which includes the time value of prepaid monies, has been exceeded.

Because the five percent (5%) maximum constitutes a mandatory ceiling on franchise fee charges (a benefit which may accrue to ETI) we will reserve ETI's right to renew, without prejudice, its claim for time value monies, at the end of the franchise term. Thus, we reject the City's argument that, because the franchise agreement was executed in 1980 prior to the passage of the Cable Act, the time value provisions of that Act can have no effect on ETI's rights for the period subsequent to the effective date of the Act.

## VI.

We have held that the release executed by ETI in favor of the City in January 1984 bars all of ETI's claims as asserted in its amended complaint, with the sole exception of ETI's claim for the time value of its $2,700,000 prepayment for the period following the enactment of the Cable Act. Therefore, the district court's order of August 4, 1987, as amended by the district court's order dated September 3, 1987, will be affirmed in its entirety, but without prejudice to ETI's right to renew its claim for the time value of its prepayment if, and when, deemed appropriate, but in no event prior to the expiration of its present franchise term.